# Richmond

GEORGE PITTMAN V. COMMONWEALTH OF VIRGINIA.

April 13, 1942.

Record No. 2559.

Present, All the Justices.

The opinion states the case.

*A. A. Bangel* and *Leo P. Blair*, for the plaintiff in error.

*Abram P. Staples, Attorney-General, Joseph L. Kelly, Jr., Assistant Attorney-General,* and *Carrington Thompson, Special Assistant,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

This is a writ of error to a judgment, sentencing the accused, George Pittman, in accordance with the verdict of the jury, to confinement in the penitentiary for the period of fifteen years for forcible rape.

It is assigned as error that the verdict of the jury is without evidence to support it and that the court erred in refusing to set aside the verdict and award a new trial.

The accused, a widower twenty-six years of age, lived one-half block from the prosecutrix, Wilhelmina Cole, in the city of Portsmouth. They were acquaintances and for several weeks before the alleged assault the accused had been a frequent visitor in the home of the prosecutrix. The case of the Commonwealth is thus displayed by the record:

The first witness on behalf of the Commonwealth was Dr. Vincent J. Meads, who testified that he called at the home of the prosecutrix in response to a telephone message from her mother at 2:00 o'clock in the morning. When he called at her home she was composed and did not show any great emotion over the affair. He took the girl to the King's Daughters' Hospital and there made an examination of her for the purpose of developing as much physical evidence as he possibly could. The only evidence found by him was a red splotch or bruise on her right leg about six inches below her groin and a small spot of blood in the vagina. There were no bruises, marks, scratches or other signs of violence to her person or clothing. There were no tears or bruises in or near the location of her privates. A smear test was made at the hospital by the doctor and corroborated by laboratory tests

the following morning, each of which disclosed there was "no sperm" in the smear.

Officer W. J. Wilkins testified that he arrested the accused at his home on the night of August 19, 1941, on a warrant charging him with rape, and that the accused denied that he had committed the crime of rape.

Officer J. R. Soule testified that he, along with Officer W. J. Wilkins, went to the home of the accused to make the arrest on the warrant and that the accused told him that he was not guilty of any rape, but he did not deny having copulated with the girl.

Betty Pearl Morris testified that she and Frankie (the sister of the prosecutrix) went to the Hollywood Studios about 7:00 P. M., for dancing lessons and found Wilhelmina (the prosecutrix) already there. About 8:00 P. M., Wilhelmina left the dancing academy to go home, but she and Frankie remained to assist Mr. Keyes in instructing pupils. About 9:00 o'clock she and Frankie left the dancing school, went to the drug store and then to Wilhelmina's home. She was the first to enter the house and found George Pittman sitting on the couch. She spoke to him and then went over to the victrola. She asked him where Wilhelmina was and Wilhelmina heard her and called her to the bathroom, the door of which was latched from the inside. Wilhelmina unlocked the door and when Betty went in she found her crying and saying, "He got me down," that she could see there was something wrong because of Wilhelmina's clothing and hair, and that they went out and called Frankie (sister of prosecutrix). This witness, Frankie, the prosecutrix and the two boys, who had come with Betty Pearl and Frankie, then went into the living room and danced a while. Shortly afterwards, George Pittman, having taken a few drinks, returned and asked to see Wilhelmina. He was granted this permission and he talked with Wilhelmina and Frankie for a while and then left.

Ernest Price was next called and he testified that he and George Pittman went to the Cole home at about five minutes after nine and waited for the girls to come home; that he was

there about five or ten minutes when Wilhelmina came home, went into the house, put her purse down, came back out and sat on the porch with George. She asked him not to go, but he thought three was a crowd, so he went to his home, sat on the porch and waited for Frankie to come home.

Mrs. Frankie Cole, mother of the prosecutrix, testified that Wilhelmina was seventeen years old and that she knew George Pittman, who had been a regular visitor at her home. On the evening of August 19th, she had taken her youngest daughter to Fort Story to entertain the soldiers, and she returned to her home about a quarter to twelve. Not finding anyone at home, she thought that her daughters had gone to the drug store, and while she was waiting for them to return, Mrs. Morris came to the house with her daughter and repeated what had been reported to her. She then took Frankie to George Pittman's home, where she engaged in conversation with him and he told her that he was sorry. She told him that she could put him in the pen for this, and he replied that he knew it. Upon being told that Wilhelmina was having medical care, he offered to pay all medical expenses. When her husband came home at 12:30 o'clock that night Mrs. Cole told him about it, and they sent for the police officers to arrest George Pittman. They also sent for Dr. Meads who took Wilhelmina to the hospital for an examination.

Mrs. Pearl Morris, Commonwealth witness, testified that she is the mother of Betty Pearl Morris; that on the 19th day of August, 1941, her daughter and the two Cole girls came to her home and told her what had happened.

Miss Frankie Cole testified that she went to the dancing studios with Betty Pearl Morris and that her sister, Wilhelmina, arrived at seven o'clock. Wilhelmina left about 8:30 o'clock and she remained with Betty Pearl to assist Mr. Keyes with some of the other pupils. Betty Pearl, Frankie and a couple of boys arrived at the Cole home about 10:00 o'clock. George was sitting on the sofa, she introduced the two boys, and asked him where Wilhelmina was. Betty Pearl called her, and she went back to the bathroom, talked to her sister and then she, the prosecutrix, Betty Pearl and the two boys

remained in the front room, where they danced for half an hour or so. She asked the accused to leave, he did leave, and came back about half an hour later. Upon his return trip, George Pittman asked them not to tell their mother and not to tell anybody.

Wilhelmina Cole, the prosecutrix, testified that she was seventeen years of age, attended business college and dancing school, and knew George Pittman, who lived across the street about half a block from her and visited her home occasionally. On the night in question, she went to dancing school at eight o'clock and remained until eight-thirty o'clock and went home by bus. When she arrived, she found Ernest Price and George Pittman sitting on her front porch. She had been told by George Pittman the preceding night that he would be watching for her that evening. No one else was home and she then went in the house, put up her purse, came back and sat on the porch with the two boys. She asked Ernest to stay, but he left. George Pittman started around the house to see her father's dogs, but he came back and they then sat on the porch for a while. George Pittman went in the house, sat on the divan and started reading a book, and— "I went on in the kitchen and got me a glass of water and came on back in the front room and sat on the other end of the divan. We sat there for a while and George put his book aside. I went over to the victrola and got halfway and George came up behind me and put his hand on my shoulder. He started pulling me, and I thought I would start fighting and trying to get away from him, and he threw me down on the divan, and I locked my legs together. He threw himself down on top of me and pinned me down with his shoulders, and he forced my legs apart with his knees, and while he was doing it I was trying to get away, and I was crying, nervous and scared and everything, and he must have heard my sister drive up, and he jumps up and said, 'What am I going to do?' and I went in the bathroom and locked the door."

When the evidence of the prosecutrix is viewed in the light of sympathy it does not bear the impress of being inherently

incredible, but when tested by the cold facts as shown by the evidence and the surrounding circumstances it must be admitted that it will not stand that legal test which the law imposes.

On cross-examination, these, facts are divulged: The accused told the prosecutrix the preceding evening he would be watching for her return home; she knew if he was at the home they would be alone; when they went in the house the accused sat beside her; the light in the room was burning; when accused put his hand on her shoulder as she started for the victrola and began pulling her towards the divan, she did not make an outcry; she did not even ask him to desist; she made no effort to scratch him, tear his clothing or put any marks upon him, though her hands were free; when she heard someone at the front door during the commission of the act and was then released, as she says, by the accused, instead of seeking protection, she ran into the bathroom and removed all evidence of sexual intercourse; this was done before she called the Morris girl and told her what had happened; after informing the Morris girl and her sister of the attack, she went back into the room where the accused was seated on the divan, and began dancing; she did not make any charge against him and he remained until requested to leave by her younger sister; when he returned later on and requested her not to tell her mother anything, she did not upbraid him in the slightest.

[■] Then the evidence of Dr. Meads, the examining physician, is most enlightening. In positive language, he stated that his examination of the prosecutrix failed to show any bruises (except the bruise on the leg), marks, scratches or other signs of violence on the neck or body. He further stated that her clothing was not torn and that there was no perceptible lacerations or bruises in or near the vagina, and that a "smear test" failed to disclose any evidence that an emission had been accomplished. This last statement of Dr. Meads is corroborative of the evidence of the accused that he refrained from completing the sexual act upon the request of the prosecutrix. Without going into further

details, it is the contention of the accused that the act of sexual intercourse with the accused was committed with her full approval and consent. While the admitted rule of law is that the verdict of the jury has resolved all conflicts in the evidence against the accused, it is also true that courts should not permit a jury to ignore the law and the evidence in arriving at a verdict.

■ "Rape is the unlawful carnal knowledge of a woman, by force and against her will." Davis's Criminal Law, p. 127.

It is significant that the only force, if any, employed by the accused to overcome the resistance of the prosecutrix was that he threw himself on top of her and pinned her down with his shoulders. There were no threats of violence, no choking, no real injury to the female parts, either external or internal. While the record clearly demonstrates that the conduct of the accused was on the night in question most reprehensible, yet if it be true that the admitted act of sexual intercourse was without violence, then the accused should not be convicted of rape. There are certain physical facts which tend to sustain the contention of the accused. It is inconceivable that a squirming, wriggling woman, with her legs locked together, could be raped without being subdued, while on a divan which was only eighteen inches wide, and with a back about twenty inches high.

■ In our opinion, the present record does not establish the guilt of the accused beyond a reasonable doubt. For this reason, the judgment will be reversed and the case remanded for a new trial, if the Commonwealth be so advised.

*Reversed.*