# Richmond

## CLYDE YOUNG v. COMMONWEALTH OF VIRGINIA.

January 13, 1947.

Record No 3157.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*James G. Martin & Son* and *Tom E. Gilman,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant, Clyde Young, was convicted by a jury of rape of the prosecutrix, Jeanne Lindbergh, by force, and sentenced to imprisonment in the penitentiary for five years in accordance with the verdict. We are asked to reverse that judgment, chiefly because the verdict is contrary to the evidence and plainly wrong.

It is admitted that there was sexual intercourse between these parties. The prosecutrix says it was by force and against her will. The defendant says it was with her consent. The prosecutrix gives a circumstantial account of the matter, altogether different from the version of the defendant. If her testimony is credible, it is sufficient, for a conviction of rape may be sustained upon the uncorroborated testimony of the prosecutrix if the guilt of the accused is believed by the jury beyond a reasonable doubt. *Addington* v. *Commonwealth,* 161 Va. 975, 170 S. E. 565. It is not sufficient to warrant a verdict of guilty beyond a reasonable doubt if it is inherently incredible, or so contrary to human experience or to usual human behavior as to render it unworthy of belief. *Legions* v. *Commonwealth,* 181 Va. 89, 23 S. E. (2d) 764; *Terry* v. *Commonwealth,* 174 Va. 507, 6 S. E. (2d) 673.

Her version of the occurrence is substantially this: She was 28 years old and lived in California. She left there December 18, 1945, driving a 1939 Plymouth coupe, and came to Magnolia, New Jersey, on Christmas Eve, to visit her parents. She had brought two Coast Guard lieutenants along with her to New Jersey. She left New Jersey, she said, at 2:00 a. m., December 31, and drove to Norfolk, picking up a sailor along the way. She was going to visit someone in Miami, Florida, whose address she declined to give. Something got wrong with the water pump in her car and at about 5:45 p. m., December 31, she drove up to a garage in a community known as Broadmoor in Norfolk county on Highway 13, and there the sailor got out. The defendant, Clyde Young, was working in that garage. She wanted to find out what was the trouble with her car and he told her a new water pump was needed and agreed to install it.

She said she had lost her wallet with all her money in it and wanted to pay for the work by a check on a California bank, which the garage people were not willing to take so she deposited a spare tire as security for the work and material. While Young was working on the car she went next door to a restaurant and waited there or at the garage while the work was being done, and around nine o'clock the defendant drove up and blew the horn for her to come out. He told her that the reason she had had so much difficulty with the other water pumps was that the car had not been tested out previously and told her to get in the car and he would prove this one was properly installed. She got into the car and the defendant picked up another fellow named Glenn Boykins and they drove up the road on Route 13. The defendant said the repairs were not working properly and they were looking for parts for the car. As they drove along they picked up another girl, Mrs. Margaret Quinn, who was standing on the side of the road. The prosecutrix was sitting between the two men and Mrs. Quinn sat on the lap of Boykins. The prosecutrix said that she soon fell asleep and was awakened at midnight by the bells ringing in

the New Year. Young and Boykins had some whiskey in the car and she threw it out the window and did not drink any of it.

They got back to the filling station or restaurant about 1:30 a. m.; Boykins and the girl left, and the prosecutrix went into the restaurant to get some coffee. The defendant drove off in the car and came back about half hour later. He had the keys to the car and while he was gone she asked a fellow who was working in the station what she could do to get the keys and the car back and he said, "You will have to watch him. When he is drinking, he is a maniac." She went back out to the car and the defendant made her get in saying he was going home. He drove around for some fifteen or twenty minutes and went into a back road where it was dark and there was no house and nobody near. She said, "He tried to rape me then, and I fought him off for several hours, and then he threatened to kill me if I did not give in." She weighed 103 pounds.

He was not successful in that effort, and after staying there for awhile he drove off down the same road, kept driving around and finally turned off the main highway and pulled in behind another car in which were some people the defendant knew and he got out of the car to talk to them. She went over and told the girl and the fellow with her to please call the police, that the defendant had threatened to kill her if she did not give in. She tried to get into their car but they pulled the windows up and drove away. This is her account of what then happened:

"Q. Did you try to get away at that point, other than trying to get in the car?

"A. Yes, sir, I ran up the road.

"Q. What happened?

"A. He came after me and knocked me down, and drug me back to the car.

"Q. Where did he put you then?

"A. He threw me across the seat of the car and started choking me.

"Q. Did he choke you severely, or did he just have hold of you?

"A. Severely.

"Q. And then what happened, Miss Lindbergh?

"A. He tore my clothes and then raped me."

She said she fought him as best she could, and screamed, but after he choked her she could not even talk. It was just getting light at that time. After that she said they stayed there about three hours and then went to the Hollywood Inn. The girl that she had asked to call the police was there but ran out the side door when she saw the prosecutrix. At the Hollywood Inn the defendant ordered a drink for her, which she refused to take, but he forced her mouth open and poured it down her. He told her there that the only way she could get rid of him was to get a check cashed, get her tire and get out of town. She wrote a check on Broadmoor Garage for $11.75 and they stopped at several places to try to cash it and nobody would because it was on a California bank. From Hollywood Inn he next drove to White's Place near the garage and ordered steaks. She asked there if they had a telephone and they said no, that the nearest was at the Tavares Inn. When he found out she had asked for a telephone he made her go back out to the car and they drove up to a place called the Three Sisters. The girl there said she would cash a check and told her to make it out to Clyde Young, which she did, for $10, and got the money on it. She then told the defendant to go back down to White's Place and cancel the order there for the steaks and the defendant took the car and drove off. She told the girl what had happened and asked if there was a telephone there and the girl said there wasn't but she could find one about a mile up the road. She did not eat the steak but paid the girl for it and while she was looking for the money she found a key to the car that she did not know she had. She then ran up the road towards the Tavares Inn and Young overtook her in the car and made her get in and took her back to the Three Sisters. She told him that she was sick and went outside.

He followed her out and told her not to make a fool out of him and she said, "Don't worry." He went back into the place and she jumped into the car, put the key in and drove down to the garage, gave the man there $10 and he put her tire in the car. About that time Young came running up and she told him she was going to call the police. She went over to where there was a telephone and called the police. In the meantime he took the car and drove it off and the police later found it.

On the basis of that much of what she said, her story is not incredible. But when what she said and what she did are compared, this picture appears:

It is to be presumed that she knew something of the facts of life. She had been married and divorced and was four years older than the defendant. She had driven across the continent and down to Norfolk with only male companions. It was about dark when she arrived at the garage where the only people around were four men. There appeared no pressing need to have her car fixed that night. She said she meant to go to a hotel, but she admitted that one of the men at the garage offered to take her to a hotel and to bring her back next morning but she did not wish that.

She knew she had no money when she came to the garage. "In the meantime", she said, "I had found out I had lost my wallet with all my money in it." There was strange indifference to this misfortune. Coming down from New Jersey she had stopped only in Maryland to get breakfast. She said she did not miss her wallet until she got back into the car there, and then looked around and did not see it and assumed that she had left it at home. She was proceeding to Miami, Florida, without funds, trusting to her ability to get along in some way she did not explain.

It was some three hours before her car was fixed. There was evidence, undenied, that she spent part of that time in the garage playing with one of the men who had an old fan belt and was chasing her around the car. The weight of the evidence is that the defendant arranged to see her after the car was fixed and that she drove away in the

car and came back to fill this engagement. She said, however, that the defendant drove up in front of the restaurant, which was next door to the garage, and blew the horn for her to come out, and invited her to get into the car so he could prove that the water pump had been properly installed. They then picked up Glenn Boykins and then a girl standing by the roadside, who sat on Boykins' lap in this single-seated car. Prosecutrix sat between the defendant and Boykins and very trustfully fell asleep, to be awakened at midnight by the bells ringing in the New Year. They drove back to the filling station and Young left with the statement that he would be back. When he came back some half hour later he said he was going home and made her get into the car. He did this by pushing her over after she had gotten into the car voluntarily, as her cross-examination shows. That was about 1:30 a. m. He drove up the road and she presumed he was going home. Instead he took her on some back road and there, as she said, tried to rape her and threatened to kill her if she did not give in. But she did not give in, she said, and he resumed driving until finally he turned off the main highway, pulled into a place where there was another car with people in it whom he knew, and there he raped her in the manner above detailed.

On cross examination she was asked how he got her under the steering wheel and she said the seat was pushed back; that the defendant slapped her and tore her coat; then she said he hit her on the left cheek; that he dragged her over the dirt road to the car and there had intercourse with her; and then she gave this account:

"Q. What kind of clothes did you have on?

"A. I had a pair of slacks on and this fur coat.

"Q. Slacks?

"A. Yes.

"Q. Any underclothes?

"A. Yes.

"Q. Pants?

"A. Yes.

"Q. How did he get those off?

"A. He tore them.

"Q. What?

"A. He tore them.

"Q. He tore them?

"A. Yes, sir.

"Q. He tore what?

"A. The pants and the slacks. He pulled the buttons off of the slacks, and the zipper was jammed, and he tore my coat.

"Q. He pulled the buttons off the slacks?

"A. That is right.

"Q. And what about the pants?

"A. He tore them; he tore the coat.

"Q. He didn't take the pants, or the slacks, off?

"A. Yes, sir.

"Q. He took them off?

"A. Just about off.

"Q. Over your feet?

"A. Yes, sir.

"Q. What?

"A. Yes, sir.

"Q. What were you doing then?

"A. I was kicking and screaming and hollering. I had been fighting him all night long. I was darn near exhausted. After he choked me, I didn't have any strength left."

She testified that this happened about six-thirty in the morning; "It was just getting light."

She had been riding around with the defendant since about nine o'clock the night before. She continued with him all the next day, driving around to all the places in the community, and no witness, except herself, among the many who saw her at those places testified to any complaint by her that she had been raped, but to the contrary that there was nothing about her person, her clothing or her manner to suggest that any evil had befallen her.

She said that they first came back to the Hollywood Inn where they remained some twenty or twenty-five minutes, and there she made out a check to the Broadmoor Garage

and "I went out to several places and tried to get the check cashed." They went to White's Place, a short distance away, and ordered steaks. They left there before the steaks were ready and went to a place called Three Sisters, where they ordered steaks and drinks, and she told him to go back down to White's Place and cancel the order there, which he did, driving her car, and "that was perfectly all right, yes."

From the Three Sisters came the Commonwealth's witness, Helen Deer, who testified that this couple came to her place about 4:15 or 4:30 in the afternoon of January 1; that was some ten hours after the prosecutrix said the defendant raped her that morning. Young came in, leaving the prosecutrix in the car, and this witness asked him if that was his wife. He said, "No", and went to the door and called, "Come on in, Jeanne." She came in and he said, "Helen, this is Jeanne." They had steaks there. The prosecutrix said her throat was sore, but she talked all right, and Mrs. Deer did not notice any marks of violence about her face or neck, and her clothes were not disarranged; there was no quarreling or fighting between them, and "That's why I couldn't believe it when she told me." She explained that she had asked the prosecutrix if the defendant had anything to do with her, and she said he had but did not claim that it was done by force or against her will.

Despite her statement that the defendant accomplished his purpose by striking her on the left cheek, knocking her down, dragging her over a dirt road, forcing her into the car and tearing her slacks and pants to take them off, Officer Barkley, witness for the Commonwealth, who answered her summons and saw her about six o'clock that evening, testified he saw no scratches or licks or bruises about her; that her coat was torn about the sleeve or the pocket but her slacks and top shirt were intact. She did not claim she had any opportunity to make repairs during the day she had spent with the defendant. Although she was taken to a hospital and examined, nobody testified to any condition indicating the use of force upon her.

The places she and the defendant visited during that

night and day, Hollywood Inn, White's Place, Three Sisters, Tavares Inn, the garage, Truelove's Place, Russ' Seafood Place and others, were all there in the community of Broadmoor, as shown by her testimony and by the pencil sketch filed by the defendant. The roads on which these places were situated were heavily traveled—main thoroughfares. In explanation of her failure to get out of the car or drive it off during her many opportunities, she said the right door had been kept locked from the outside so it would stay closed and that the defendant kept the keys all the time. The former statement was denied by the mechanic who repaired the door. Officer Barkley said she had an extra set of keys and she said this in relating her belated discovery of the key which she finally used in driving away from the defendant: "While I was looking for the money, I found a dashboard key to the car. I had never used it, and I don't know how it ever got in there, because I always keep my other keys in there, and, if I lose one, I lose both of them."

In possession of this key she took charge of the car, drove down to the garage, went in, gave the man $10 and got her tire. About that time she said Young came running up and she told him she was going to call the police, which she did, and Young then took the car and drove away in it, and the police later found it behind his house.

Thirteen witnesses besides the defendant testified for him. They included people who saw the prosecutrix at the different places where she and the defendant went after the alleged offense. They testified, as stated, that the appearance and manner of the prosecutrix were normal at all those times and places and that she at no time made any complaint. It is true there was much in the conduct of some of these witnesses to discredit their testimony. Two of them testified that if the prosecutrix had made complaint to them they would not have done anything about it. Another, named Johnson, a fellow-employe of the defendant, who was in the garage when the prosecutrix came there, was a married man with a family who testified that he did "a lot of running

around at night;" and that he had intercourse with the prosecutrix earlier in the night in his car a few feet from the intersection of two main highways and where the lights from the heavy traffic there would sweep across his car. From the evidence it was not a community of high moral tone, but it was the community in which the prosecutrix chose to stop and they were people with whom she chose to associate.

██ ██ Why the prosecutrix made the charge does not satisfactorily appear. In her testimony she accused the defendant of having cashed one of her checks and not giving her the money. The defendant undertook to explain the charge as having its origin in a request for money, but it must be said that this testimony added nothing to his stature as a witness. A reading of his testimony makes it understandable that the jury would prefer to convict him. He was a married man with a family in North Carolina. He had there been convicted of armed robbery and was on parole at the time of this trouble. His testimony was a repulsive account of lust and liquor which he recited in great detail and evidently without shame. If it was a choice between her veracity and his, we would not find fault with the jury for accepting her statement. His conduct doubtless merited punishment, but that is not the measure of the correctness of this verdict. If there is not sufficient evidence to establish beyond a reasonable doubt that he is guilty of the offense of which he has been convicted, then the verdict is plainly wrong and it is our duty to set it aside. This we are compelled to do because there is too much that is contrary to human experience in her version of the matter when analyzed in the light of the facts and circumstances shown to exist, to say that the guilt of the defendant has been proved as the law requires. Rape is the unlawful carnal knowledge of a woman by force and against her will. *Pittman* v. *Commonwealth*, 179 Va. 477, 19 S. E. (2d) 672. This record does not establish the essential elements of rape beyond a reasonable doubt.

The judgment of conviction is therefore reversed and the case remanded for a new trial if the Commonwealth is so advised.

*Reversed and remanded.*