**People of the State of Illinois, Plaintiff-Appellee, v.
Jessie L. Barfield, Defendant-Appellant.**

**Gen. No. 52,910.**

First District, Fourth Division.

August 6, 1969.

Gerald W. Getty, Public Defender of Cook County, of
Chicago (James D. Hennings, Shelvin Singer, and

James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James Meehan, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McNAMARA delivered the opinion of the court.

Defendant, Jessie L. Barfield, was charged with the crime of forcible rape. After a bench trial, he was found guilty and sentenced to the penitentiary for a term of three to six years. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt.

At trial, complainant testified that on Saturday, October 8, 1966, she came home from work about 7:00 p. m. She lived at 2145 Lake Street, Chicago. Her husband was in Peoria, Illinois, on a trip. She started cooking, and gave her 5-year-old son a bath. She was fully dressed, as she was planning to go to a musicale that evening. She heard a knock and her son answered the door. Two men, Jessie and Joe, were talking to her son. Jessie is the defendant. She didn't know either of them, but had seen them before. They asked whether her husband was at home, and she told them that he was not. Joe said that they would leave, and both started toward the door. As Joe went outside, defendant closed and locked the door, and ordered complainant to strip off her clothes. Joe knocked, but defendant refused to open the door. He took a knife out of his pocket and, in the presence of her son, again told her to strip. She refused and he threatened to kill her. He pushed both of them into her bedroom and told them to get on the bed. She said that she could not do that in front of her son. Defendant then put the knife on her son, who got on top of the bed and lay down. She closed the door and defendant forced her into her other two sons' bedroom.

She had previously taken off her dress and slip, so she was just in her girdle, garter belt and stockings. After forcing her into the other bedroom, he had intercourse with her. Her son, Roger, had come home while they were having intercourse. The phone rang, and Roger answered it. She reached her hand out of the door and Roger handed the phone to her. A friend of her husband's was on the phone, but she could not say anything, and defendant forced her to hang up. He told her to take her garter belt off, they changed ends of the bed and had intercourse again. He asked if she had any money, and she gave him the 6 dollars she had in her purse after he stated that he would leave. While she was naked, defendant grabbed her hand, and told the children he was going to take her away. He then pulled her from the fourteenth floor to the ninth floor. At this time she was wearing a sleeveless duster which had been on a chair near the door, and which had been thrown to her by the defendant. The duster had no buttons, and she was not wearing shoes. On the ninth floor he made her lay down and put his mouth next to her vagina. As some people came near, he put a knife to her stomach and told her not to scream. She identified the knife in court. They went out of the building, down a few streets and through an alley. When she complained of rocks on the street, defendant took his shoes off and let her use them. He had one hand around her and the knife at her side. He took her into the rear of a three-story building, and up to a bedroom on the third floor. He told her to take off her duster and lie down on a filthy bed, and had intercourse with her again. She stated that she had to go home, but he told her to relax and go to sleep. Defendant told her that he was going to get her children, and that the five of them would go to another city together. All in all, he had three acts of intercourse with her in her apartment and three in the other apartment. He also put his mouth against her vagina

twice. She did not consent to any of the acts. After he fell soundly asleep, she put on her duster and his pants, put the knife in the pants pocket and returned to her babysitter's apartment, located in the same building in which she lived. She identified his pants in court. She told her babysitter what happened, and the police were called. She led Officer Foster to the apartment where defendant had taken her. There she identified defendant. She was examined at County Hospital.

On cross-examination, she testified that her husband was visiting his brother in Newport, Illinois. Defendant had been around the building for about a year. Her son, Roger, was 12 years old at the time of the incident. It was a distance of four blocks to defendant's apartment and they passed quite a few people, but the defendant wouldn't let her say anything. On her way back, she saw two plainclothes policemen sitting in a car. She told them that she had been raped, and they offered her a dime to call the police. She told the Grand Jury that the plainclothes detectives were standing while she talked to them.

Complainant's son, Roger, testified that he was 13 years old and in the eighth grade at the time of trial. He knew the defendant prior to the occurrence. On that day, he was on the thirteenth floor porch until he came up to the apartment with his brother at about 8:30 p. m. They were sitting in the living room listening to the radio when the phone rang. He called his mother, but got no answer. He looked in her room and saw his little brother sleeping, went toward his own room and called his mother again, at which time she stuck her hand out of the door and he handed her the phone. He then returned to the living room, and listened to the radio some more. Later defendant came out with his mother, who didn't have any clothes on. He had a knife in her side. Defendant reached in the closet, threw her a gown and dragged her out of the apartment. His mother didn't

have any shoes on, her hair was messed up and she was crying. After she left, he and his brother were scared, and they went back and sat down.

On cross-examination, Roger testified that he was 12 years old at the time of the incident. He and his brother returned to the apartment after 9:00 p. m. that night. After he gave the phone to his mother he went back to listen to the radio. He did not hang the phone up. After his mother left, they sat on the couch all night until she got back at 6:00 a. m. the next morning. He did not call the police because he was too scared.

Officer Arthur Foster of the Chicago Police Department, testified that he went to 2145 Lake Street at 11:55 p. m., and had a conversation with complainant. She was extremely nervous and excited. She was barefooted, dressed in a pair of men's pants and an old jumper. She gave him a knife, which he identified in court. She led the officers to an apartment, and pointed defendant out. They awakened him and placed him under arrest.

It was stipulated that defendant was 18 years old. It was further stipulated that stain of human sperm were found around the fly area of the pants which had been previously admitted into evidence.

Defendant, Jessie Barfield, testified that on October 8, 1966, about 8:00 p. m., he and a man named Joe went to complainant's apartment. Complainant let them into the apartment. Her little son was there, but was sleeping. They went into the living room, sat down on the couch and were offered a drink. After about 30 minutes, Joe left. The complainant's older son came in, so defendant left. He walked down to the 12th floor, the highest floor to which the elevator ran. As he was waiting for an elevator the complainant came down. He said he was going to a friend's house, so they both walked over to the apartment. The friend was not there, but the door was unlocked. They both got undressed, but he could not

have intercourse because he was too high. He fell asleep and the next thing he knew the police were awakening him.

On cross-examination, he testified that complainant called him into the bedroom of her apartment and asked him if he would take his clothes off but he refused. The phone rang and she answered it, dressed only in a slip.

Defendant contends that he was not proved guilty beyond a reasonable doubt, arguing that the evidence presented by the State was improbable and unlikely, and that the State did not prove that the acts were forcible and against the will of the complainant.

 The credibility of the witnesses and sufficiency of the evidence are matters within the province of the trier of fact, and his determination will only be disturbed if the necessary degree of proof is lacking. People v. Hansen, 28 Ill2d 322, 192 NE2d 359 (1963). However, the testimony of a witness may contain its own impeachment and may be so improbable as to be disregarded. People v. Booher, 73 Ill App2d 226, 218 NE2d 779 (1966); People v. Vail, 74 Ill App2d 308, 221 NE2d 165 (1966); People v. Pennington, 75 Ill App2d 62, 220 NE2d 879 (1966).

In People v. Faulisi, 25 Ill2d 457, 185 NE2d 211 (1962), the court, at page 461, stated:

> "Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, (citations omitted) and it is the duty of the reviewing court not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt . . . ."

 Upon the careful scrutiny required by a court of review of the State's evidence, we find that it was not sufficient to sustain defendant's conviction.

Complainant testified that the defendant arrived at her apartment about 8:30 p. m. and that she returned to an apartment in her building about 11:00 p. m. During that 2½ hour period, she testified that defendant had committed 6 acts of forcible intercourse on her, along with two acts of cunnilingus. After the first three acts which occurred in her apartment, she testified that at knifepoint she was dragged down 14 flights of stairs in her building, interrupted on the 9th floor for an act of cunnilingus in the hallway. They then proceeded to walk at least four blocks, each of them barefooted for part of that walk. They then walked up three flights of stairs to the second apartment. There, three more acts of forcible intercourse were committed; and after defendant had fallen sound asleep, she returned, barefooted, to an apartment in her building. Only on cross-examination did she mention that she stopped once to inform two policemen that she had been raped. We find that such testimony, both as to the number of sexual acts committed with a resisting woman and as to the amount of physical activity, all occurring within such a brief period of time, was highly improbable and contrary to human experience. Her testimony was so improbable as to raise substantial doubt as to its veracity.

In addition to the improbable evidence, there was also much testimony presented by the State which was so unlikely as to cast doubt on defendant's guilt. The complainant's five-year-old son was forced into a bedroom and threatened with a knife. Yet he went to sleep while his mother was being raped in the next room. Two other sons, aged 9 and 12 years, returned home while their mother was being raped, but heard no sounds and listened to the radio. After the 12-year-old boy answered the telephone, he called his mother, received no answer, looked into her bedroom and saw his brother sleeping. As he approached his bedroom his mother stuck her arm

out of the door and took the phone. Whether he returned immediately to his seat or waited for his mother to return the phone to him, we are certain that he neither saw nor heard the defendant. The oldest boy subsequently saw his mother dragged out of the apartment at knifepoint by defendant, a man whom he had known, yet he did not call the police or make any outcry, although his mother did not return until 6:00 a. m. the following day. Later in the second apartment, after forcibly raping complainant six times, defendant discussed with her their leaving the city together with her three children. Then he fell soundly asleep, and so remained until the police awoke him. We believe such a recital of facts to have been extremely unlikely, and in some instances, incredible. It was so unlikely as to make defendant's guilt subject to reasonable doubt.

■ Moreover, in order to prove the charge of forcible rape it must be proved that the act was committed by force against the will of the female. People v. Faulisi, 25 Ill2d 457, 185 NE2d 211 (1962) ; People v. DeFrates, 33 Ill2d 190, 210 NE2d 467 (1965).

There is no evidence of any resistance or struggle on the part of complainant. While force may prevent outcry by a rape victim, complainant's own testimony was that they walked for four blocks on a Saturday evening in a crowded neighborhood and passed many people. During this walk, defendant took off his shoes to give them to her. Even then, complainant made no outcry or attempt to escape.

Defendant also points out several instances of inconsistency in the evidence presented by the State. In the view we take of the case it is unnecessary to discuss them.

■ We are not satisfied that defendant was proved guilty beyond a reasonable doubt. A conviction can be sustained only on credible evidence which removes all

reasonable doubt of defendant's guilt, and it is the insufficiency of the State's evidence which creates such doubt. People v. Coulson, 13 Ill2d 290, 149 NE2d 96 (1958).

The judgment of the Circuit Court is reversed.

Judgment reversed.

DRUCKER, P. J. and ENGLISH, J., concur.