239 So.2d 284 (1970)
Cecil Edward SMITH, Appellant,
v.
STATE of Florida, Appellee.
Nos. 68-355, 68-393.
District Court of Appeal of Florida, Second District.
August 12, 1970.
Rehearing Denied September 17, 1970.
*285 Walter R. Talley, Public Defender, Bradenton, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
MANN, Judge.
"I was this forenoon with Mr. secretary at his office, and helped to hinder a man of his pardon, who is condemned for a rape. The under-secretary was willing to save him, upon an old notion that a woman cannot be ravished: but I told the secretary, he could not pardon him without a favourable report from the judge; besides, he was a fiddler, and consequently a rogue, and deserved hanging for something else; and so he shall swing."
 Jonathan Swift: 1 Journal to
 Stella 319-320 (July 25, 1711)
 (ed. Williams 1948)
Cecil Edward Smith is a Bad Guy convicted of rape on the uncorroborated testimony of a Good Girl.
He has served time in three prisons for four felonies. His stomach, his chest, both arms and both legs are tattooed.[1] His lawyer addressed him as "Boy," though the time is long since past when any man is "Boy" in an American courtroom.
She was a school teacher, in her middle twenties, a virgin. A witness testified, without the slightest contradiction, to her spotless reputation. She testified that she had never seen Smith before, although he had worked on her septic tank.
The complainant's testimony is all that supports the verdict, but it covers every element of the crime. She says that after one in the morning she heard a noise and awoke to find Smith entering through her kitchen window. She tried to leave through the door, but was restrained. Once, momentarily, she turned the light on, but he turned it off. He threatened her with death or serious bodily harm, which under our precedents suffices to show that the act was forcible.[2] Even while he was asleep within her apartment or was in the bathroom she feared him and for this reason did not telephone the police.
When we compare her testimony with the requirements of Florida law we learn that even without corroboration her testimony is "sufficient." Our new standard jury instructions provide, for example:

"Force: The act must be accomplished by force. Sexual penetration is not rape unless the female has resisted to the extent of her ability under the circumstances and has used all reasonable effort on her part to prevent the accomplishment of the act. However, if by words, acts or both the female is placed in fear of death or great bodily harm if she resists and she fails to resist solely by reason of such fear, the force necessary to accomplish the penetration is *286 sufficient. Unless overcome by fear the resistance must continue until the actual penetration is accomplished."
"Want of consent: The act must be done against the will and without the consent of the female. If consent be voluntarily given at any time before the penetration, the crime of rape has not been committed. But consent produced by fear of death or great bodily harm is not a voluntary consent and if the female yields to the doing of the act only by reason of such fear the act is done against her will and without her consent."
"Proof: If the testimony of the female is not supported by other evidence her testimony should be rigidly examined, especially as it related to the nature and extent of the force used and as it related to the question of whether or not consent was ever finally given. However, the testimony of the female, even though uncorroborated, is sufficient upon which to base a conviction if you are convinced by it of the defendant's guilt beyond a reasonable doubt. Before you can convict the accused, you must be satisfied beyond a reasonable doubt that the alleged rape was forcible and against the will of the female since these are essential elements of the crime."
"Outcry Report: In weighing the evidence, and particularly the testimony of the female alleged to have been raped, you may take into consideration the evidence as to whether or not the female (made any outcry or call for help at the time of the alleged rape or was prevented by fear from doing so) (made a prompt report of the alleged rape to the person or persons to whom a female situated as she was would naturally make such a report.)"
The question of corroboration is settled in Florida: it is unnecessary. Doyle v. State, 1897, 39 Fla. 155, 22 So. 272. If the offense had occurred in New York corroboration would be required by statute,[3] as it is in several other states.[4] In Illinois,[5] for example, an appellate court would probably reverse with mandate for discharge for failure of the record to disclose corroboration, a result reached in several states on common law principles.[6]
But the results in Florida appeals are not markedly different despite the divergence of doctrine. Johnson v. State, Fla.App. 1960, 118 So.2d 806; Chaffin v. State, Fla.App. 1967, 204 So.2d 22. Other courts, bound as we are by the doctrine that corroboration is unnecessary, find it necessary under the special circumstances of the case.[7] These cases reach the right result on excessively circular reasoning. It makes no sense to say that corroboration is unnecessary except where the complainant's testimony is uncorroborated. And much injustice would result from affirmance where the words of the complainant are all that supports conviction and undisputed evidence in the record casts doubt on them.
The Bad Guy must be judged by the same principles which apply to the Good Guy's conviction of a bad act, regardless how much more likely it is that a Bad Guy will be disbelieved by a jury, and *287 regardless how less likely that a Good Guy would be accused, and if accused charged,[8] and if charged, convicted.
It is the classical assumption that the jury's binary verdict follows the digital deliberative process, but life teaches that the mind functions in the binary mode prior to deliberation. The traditional task of appellate judges is to determine whether the evidence in the record could, viewed most favorably to the verdict, support conviction. Yet there are more cases than we could count in which convictions have been reversed for new trials on account of "insufficiency" of evidence, and we find that the opinions in these cases do not satisfactorily articulate the principles on which appellate review proceeds. We are facing, then, a challenge to our presuppositions which has troubled me for many months.
The delay in decision of this case is one for which the writer of this opinion is solely responsible. I confess that my first study of the record and briefs and reading of the cases cited resulted in my concurrence with my brother Pierce. But that concurrence robbed me of sleep, and I withdrew it. Since then I have sought  and still seek  certainty about legal doctrine which explains and confirms my view that this conviction cannot be affirmed. While judicial insomnia is a fair indicator of an unsound concurrence it is of no help in articulating disagreement intelligently. Logic does not govern all human decision-making. Digital deliberation is an ongoing mental process, and the mind is not at rest until it issues in determination, which is often  perhaps usually  binary. The deliberative process is bypassed in our daily lives by habit (our preferences in dress or clothing) or intuition (we exclude some from our circle of friends or employees upon observing some single factor) or prejudice. Whether the consequence of this exclusion of deliberation is benign depends on circumstances: any man is entitled to eat oatmeal for breakfast, and whether he does so out of habit or as a consequence of deliberation is not anyone else's business. But judges face a dilemma: we must allow juries to determine facts and we must assume, if the record proves the assumption reasonable, that the verdict issues from deliberation and not from prejudgment.
The polarity of human thought is nothing new. Life is full of evidence of the binary mode in human thought. We spent our Saturday afternoons as children watching a lone hero in a white hat, on a white horse, ridding a community of a gang of villains in black hats, on black horses. We played cops and robbers, and cowboys and Indians. One of our hymns asks: "Are ye able to remember, when a thief lifts up his eyes, that his pardoned soul is worthy of a place in Paradise?"[9] The mind wants to differentiate clearly, to make strong distinctions, to feel secure in either the end product of thought or the processes which precede  and sometimes exclude  thought. But the human mind differentiates act from actor with great difficulty.
On what principle, then, can we evaluate the binary decision which follows a trial like this one in which the testimony of the prosecutrix, taken in isolation, covers every element of the crime of rape, although study of the record suggests strongly the possibility that the verdict was reached before, or in spite of, deliberation, and perhaps without consciousness that it was inadequately affected by it?
We venture two propositions that we think are supported by ample precedent although not expressed in these terms. Judges have for decades spoken of "insufficiency" of evidence without differentiating between the case in which evidence of one or more elements of the offense is *288 absent[10] and the case in which the elements are "proved" (i.e., testified to or shown by some evidence) but so inconclusively as to justify the granting of a new trial.[11] The failure to articulate this distinction has resulted in our speaking indiscriminately of "insufficiency" of evidence, with the result that we have failed to develop sound doctrine to guide judges in measuring the adequacy of a particular record.
Our first proposition is that there are two types of "insufficiency" and they ought to be differentiated. Fundamental "insufficiency" of evidence results from a failure to adduce even barely sufficient proof of some element of the crime, and necessitates a directed verdict in the trial court or reversal with directions to discharge the accused if judgment is entered and an appeal taken.[12]
The second type of insufficiency is found in cases in which each element of the offense may be supported by some evidence  which the jury is at liberty to believe in spite of the contrary evidence  but in which the record as a whole discloses such a possibility of error that the interests of justice require a new trial. This is such a case. Considered in isolation, the testimony of the prosecutrix is "sufficient." Read in context with the rest of the record, the interests of justice demand a new trial. In a different factual setting, consider Garner v. State, 1938, 134 Fla. 252, 183 So. 739, a larceny case in which the defendant's possession of recently stolen hogs was relied upon to support the conviction, but the Supreme Court granted a new trial because of testimony tending to show lawful possession. It leads us to our second doctrinal postulate: If the testimony of persons not involved in the alleged rape, together with the data objectively verifiable, converge upon the hypothesis that the act was not forcible, a new trial should be granted either by the trial court on motion or the appellate court on appeal, although the prosecutrix' testimony alone supplies every element of the offense.
We do not exhaust the category of cases in which the total record seems to warrant retrial: this case is clearly within it, and we need not draw lines except as concrete cases arise. Our Supreme Court awarded a new trial in a prosecution for statutory rape where the evidence of previous chaste character was "far from convincing," and the record contained "much convincing evidence of her previous unchaste character."[13] We are aware that it is the jury, not the judge, who must be "convinced," but there are times when what has obviously convinced a jury leaves the mind of the judges who must review the case "clouded with doubt"[14] to the extent that they are obliged in the interest of justice to present the matter to a second jury. As the scope of the double jeopardy *289 clause widens,[15] it becomes all the more important to articulate the circumstances in which the appellate court has the power and duty to order a new trial. Were this not so we would be forced in doubtful cases either to affirm a dubious conviction like Smith's or order discharge, a possible miscarriage of justice in either event. Some of the decisions in which new trials have been awarded have been so ambiguous that we cannot determine in which category they fall.[16] Judge Liles' opinion in Sosa v. Maxwell, Fla.App. 1970, 234 So.2d 690, illuminates the distinction. Yet the digests include key numbers for "weight and sufficiency of evidence" which include cases in both categories.[17]
Here there is reason to believe from the State's own witnesses that part of the prosecutrix' testimony is unduly influenced by her own perception of events, viewed in the light of her sexual innocence. She said she had never seen him before, but could not swear that he had not worked on her septic tank. Smith's employer, testifying for the State, said that Smith had worked at the girl's house but that he had not talked to the girl. Smith said that he was working at the other end of the house and had talked with her and had later had a "date" with her on which occasion they ate together and he took her home. The employer said also that one day as he and Smith were coming across the bridge adjacent to her home, Smith looked over, saw her fishing on the dock and said, "I see she's still living there."
She testified that she had bruises on her ribs and on her hip bones. The physician who examined her said that there was no evidence of lacerations or bruises except for "some abrasions on the inner surface of the lower lip, with some swelling there," an injury not incompatible with mutuality of passion.
She said that there were four  he modestly thought it was three  instances in which he penetrated her body. There was no evidence of semen at the physical examination, and she said she had not douched. She said that he had told her that he would not ejaculate within her, that he did not want to get her "messed up." This hardly seems like the inconsiderate act of a rapist. True, there was a time when coitus interruptus was a capital offense: the Lord slew Onan for thus displeasing Him.[18] We would doubt that that early instance of capital punishment has deterred disobedience of His commandment that we be fruitful and multiply, though it must be conceded that neither Christ's commandment that we love one another nor any of the Old Testament Ten has been so scrupulously complied with. On today's crowded planet Smith's restraint tends to confirm his version of the story more strongly than hers.
She said that he told her upon entering the house that he was an escaped convict. He says that she became frightened and cried, after daybreak illuminated for her the possibility of losing her reputation along with her previously inviolate virtue, and that he then told her to say that she was raped by an escaped convict. Unless there is some seductiveness about the former version which eludes us, the latter seems rather more plausible, the former being untrue.
She said that he removed the screen from her house and entered, and that she *290 struggled with him. She said that a pitcher was broken during the struggle. Her fourth answer after that: "Well, he came on in through the window and knocking over the glass pitcher."
He was in the house for hours: from 1:20 A.M. until around 7:00 A.M., and when he left he was traced through his automobile license. Her clothing was not torn. The transcript is too long to quote the many little indicators of doubt, but they are numerous.
She was asked by the prosecutor whether she consented. She said she did not. Judge Pierce speaks of the question as sufficiency of evidence of non-consent. It is pertinent to suggest that rape is forcible on the man's part, and that the key question is often carelessly phrased in terms of non-consent. This is a case in which the difference is crucial.[19]
We conclude that judges have historically granted new trials in the interest of justice where the record, though technically sufficient, raises so much doubt that the conviction cannot in conscience be upheld.[20]
It is clear that Smith broke and entered, but it is unclear whether his purpose was rape or fornication. We reverse and remand for either a new trial on both charges or, in the discretion of the trial judge, discharge on the rape charge and reduction of the other offense to breaking and entering with intent to commit a misdemeanor, pursuant to Florida Statutes § 924.34 (1967), F.S.A., in which event the trial judge may pass sentence accordingly. That offense is amply proved even if she did invite Smith to visit her between nine and ten o'clock, as he claims.
We agree that the allegation of denial of a speedy trial is inadequately asserted, but suggest that the Sixth and Fourteenth Amendments to the Constitution of the United States may afford less latitude than Chapter 915, Florida Statutes (1967), contrary to the State's assumption. See Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); Dickey v. Florida, 1970, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26.
Reversed and remanded.
LILES, Acting C.J., concurs.
PIERCE, J., dissents with opinion.
PIERCE, Judge (dissenting).
The following opinion was originally written as the opinion of the Court, but later my brothers on the panel parted my company, so it is now a dissenting opinion.
These are appeals in two separate cases which have been consolidated here for purpose of disposition. They both grew out of the same factual circumstances and were consolidated for trial in the Court below, resulting in a conviction in each case, followed by separate judgments and sentences.
On March 7, 1966, appellant Cecil Edward Smith was charged in two separate indictments returned into the Circuit Court for Lee County, one charging the offense of breaking and entering a dwelling house with intent to rape a named young lady, and the other the offense of rape itself. On pleas of not guilty to each indictment, they were tried together. The jury returned verdicts of guilty as to each indictment, *291 with recommendation of mercy on the rape charge. In due course the Court adjudged the defendant guilty in both cases and sentenced him to ten years imprisonment on the breaking and entering charge and to life imprisonment on the rape charge. He appeals to this Court from both judgments of conviction. Only two points are urged here for reversal, viz: (1) the evidence for the State was not sufficient to show non-consent on the part of the prosecutrix, and (2) defendant was denied his constitutional right to a speedy trial. We will discuss these points in reverse order.

Right to a speedy trial.
The alleged criminal activity occurred on February 14, 1966. Defendant was arrested on February 16, 1966. Indictments were returned on March 7, 1966. He was arraigned and pleaded not guilty to each indictment on April 11, 1966, and the arraignment and plea were duplicated on February 20, 1967. On February 20th and 21st, 1967, he was tried before jury and convicted on each charge.
§ 11 of the Florida Declaration of Rights guarantees to a defendant in a criminal case the right to "a speedy and public trial"; but what is a "speedy trial" is a distinctly relative term, dependent always upon the particular facts and circumstances of each individual case. Here the defendant was charged in two different indictments, one charge being a capital offense punishable by death or life imprisonment (F.S. § 794.01 F.S.A.), and the other a non-capital felony punishable by imprisonment up to twenty years (F.S. § 810.01 F.S.A.). Defendant was ultimately in fact sentenced to life imprisonment on the rape charge and to ten years imprisonment for breaking and entering.
We cannot say, as a matter of law, that defendant was not accorded his constitutional right to "a speedy trial", based solely upon the chronological developments of his case. It was only a little over eleven months from the time he was indicted until he was tried before a jury. This is not a constitutionally inordinate length of time between the accusatory stage and the trial stage upon charges which are as serious as any in the statutes. And the time lapse cannot be reasonably said to have operated more to the detriment of defendant than to the State; probably the opposite is more likely. The record is devoid of any reason or reasons as to why the trial was not held earlier. This Appellate Court is entirely without knowledge as to what occasioned the delay, if such there was. For all we know, it could have been through the fault of the defendant and through no fault whatever on the part of the State. Certain it is that defendant has not shown that the State was responsible.
But there is also a formidable statutory barrier precluding the raising of such question by defendant. F.S. § 915.01 F.S.A. in substance requires a defendant who "has been committed to custody to answer any criminal charge" and who desires a speedy trial, to "apply" for such trial at the current or ensuing term of Court; and in such event, the State is given three terms within which to bring him to trial.
This 2nd District Court, in Wilson v. State, Fla.App. 1967, 194 So.2d 33, construing § 915.01, said that "the defendant must file a request for a trial before this statute takes effect. Silence on the part of the accused will not activate this statute", citing the Supreme Court cases of Loy v. Grayson, Fla. 1957, 99 So.2d 555 and Kelly v. State ex rel. Morgan, Fla. 1951, 54 So.2d 431. And in Dickey v. Circuit Court, Gadsden County, Fla. 1967, 200 So.2d 521, the Supreme Court said that § 915.01 "places on the accused the primary burden for bringing about a speedy trial." In the instant case the record fails to show that defendant made any "application" or "request" for such speedy trial; therefore *292 under the aforesaid cases he may not be heard to complain.
Furthermore, even if proper and timely applications had been made, the trial was held well within the limitation of time allowed by law. § 915.01 permits trial to be held as late as a third term following commitment to custody on the charge. See Gossett v. Hanlon, Fla.App. 1967, 195 So.2d 865; State v. Williams, Fla. 1954, 73 So.2d 295; Kelly v. State ex rel. Morgan, supra.
F.S. § 26.33 F.S.A. provides for two terms a year for the 12th Judicial Circuit for Lee County, a Spring term to begin on the 2nd Monday in January and a Fall term to begin on the 2nd Monday in June of each year.
Defendant Smith was indicted on March 7, 1966, during the Spring, 1966, term. He was brought to trial on February 20, 1967, during the Spring, 1967, term. Thus, even if both the two "outside" terms are counted, namely, the terms at which he was indicted and when he was tried, the trial would still have been within the three-term maximum allowed.[1]
So the contention as to denial of a speedy trial is without merit.

Insufficient evidence as to non-consent.
The incidents upon which the charges were grounded occurred between 1 o'clock in the morning of Monday, February 14, 1966, and shortly before 7 A.M. that morning at an apartment occupied alone by the prosecutrix. At about 1:20 o'clock in the morning the prosecutrix was awakened in her room by a noise at her window, and upon looking around saw a silhouette of a man just outside. She got out of bed, ran toward the window just as he was breaking through the screen and window and coming in over a kitchen table situated just inside the window. She struggled with him, trying to push him back out, but he came on in, threatened her if she made an outcry, put his hand over her mouth and nose, told her he was an escaped convict and had to "hide out for a couple of hours", that he had a "friend" outside who was armed and had escaped prison with him, and warned her that he could kill her easily and that she had better not scream or make an outcry.
He finally forced her to take off her pajama top, finally disrobed her entirely by forcibly pulling off her lower garments, whereupon by sheer physical force and threats of dire injury he proceeded to have sexual intercourse with her four times on her bed over a period of the next two or three hours.
The foregoing are the highlights of the entire episode as related by her to the jury. She said she had never at any time consented but had resisted to the utmost, consistent with what she was convinced would be better for her life and safety. At about daybreak, he put his clothes back on, which he had taken off prior to the sexual relations, and at about 7:15 A.M. left the building and drove away in his car with a male companion. Shortly afterward he was apprehended, and after being identified by the prosecutrix, was charged with the two offenses beforementioned.
Defendant Smith, testifying in his own behalf, admitted breaking through the window and screen and having the sexual relations with the prosecutrix. He stated, however, that what they did was by mutual consent, without force, threats, or intimidation on his part. He stated that he had first had conversation with her a few minutes while with a septic tank crew doing work previously at her home, that he thereafter had a "date" with her out to the Pit Barbecue on the Fort Myers Beach Road, and that on Sunday, February 13th, in the afternoon, he saw her at the "Shopping *293 Center off of McGregor Boulevard", where they talked awhile. He asked her for a date that night and she told him to. "come up around 9 o'clock" to her house. He didn't get to her apartment until sometime after midnight, and, not getting an answer to his knock on the door, he went around and began knocking on the window, and still getting no answer he "pushed up the window, slid it up with my hand", that the prosecutrix then woke up, came to the window, and seeing who it was invited him in, that he then went in with her permission, they talked awhile, then both undressed, went to bed, and "made love" until about daylight. He admitted having intercourse "two or three times". He admitted to four previous felony convictions, having "done time in three penitentiaries."
The case presents a classic example of the conflict of evidence upon a material ingredient in the offense. The jury resolved the conflict in favor of the State, which was its right and duty. The evidence was, in my opinion, sufficient as a matter of law to sustain the verdicts, and the competency of the evidence is not challenged.
I usually take no pride in a dissenting opinion. I very rarely file one. But in this case I do. As I told my brother MANN when we discussed the case right after I filed the foregoing opinion of affirmance in January, 1969, if I had been on the jury Smith would never have been convicted, or if I had been the trial Judge he would never have been adjudged guilty and sentenced, but that since I was neither, but simply an appellate Judge, I would have to consider the case as an appeals Court judge; and viewing the conviction from that standpoint, I would have to vote for affirmance because the evidence for the State was, as a matter of law, sufficient to convict, if believed by the jury and concurred in by the trial Judge, which it obviously was.
I would affirm.
NOTES
[1] A detail supplied by his own counsel when, after having put Smith on the stand and while eliciting his version of the night's events, counsel asked that Smith drop his trousers (he had walking shorts on) and display his tattoos to the jury. Identity could not at that point have been an issue.
[2] Flowers v. State, 1943, 152 Fla. 649, 12 So.2d 772; Green v. State, 1938, 135 Fla. 17, 184 So. 504.
[3] N.Y.Penal Law § 2013 (McKinney 1944).
[4] Ga. Code Ann. § 26-1304 (1936); Iowa Code Ann. § 782.4 (1950); Miss. Code Ann. § 2360 (1942); Tenn. Code Ann. § 10786 (Williams 1934).
[5] People v. Faulisi, 1962, 25 Ill.2d 457, 185 N.E.2d 211; People v. Symons, 1961, 23 Ill.2d 126, 177 N.E.2d 185; People v. Barfield, 1969, 113 Ill. App.2d 390, 251 N.E.2d 923; People v. Bruno, 1969, 110 Ill. App.2d 219, 249 N.E.2d 252.
[6] Davis v. State, 1904, 120 Ga. 433, 48 S.E. 180; Peery v. State, 1957, 163 Neb. 628, 80 N.W.2d 699.
[7] See, e.g., O'Boyle v. State, 1898, 100 Wis. 296, 75 N.W. 989; Young v. Commonwealth, 1947, 185 Va. 1032, 40 S.E.2d 805; People v. Grudecki, 1940, 373 Ill. 536, 27 N.E.2d 51. See generally, 7 Wigmore, Evidence § 2061 (3d ed. 1940). Note, Corroborating Charges of Rape, 67 Col.L.Rev. 1137 (1967).
[8] See Note, Police Discretion and the Judgment that a Crime has been Committed  Rape in Philadelphia, 117 U.Pa.L. Rev. 277 (1968).
[9] Earl Marlatt, Are Ye Able, Published in The Methodist Hymnal at 413 (1966).
[10] E.g., Sapir v. United States, 348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426 (1955); Lampley v. State, Fla.App. 1968, 214 So.2d 515.
[11] Lowe v. State, 1944, 154 Fla. 730, 19 So.2d 106; Garner v. State, 1938, 134 Fla. 252, 183 So. 739; Fuller v. State, 1926, 92 Fla. 873, 110 So. 528; Nims v. State, 1915, 70 Fla. 530, 70 So. 565; Johnson v. State, Fla.App. 1960, 118 So.2d 806, second appeal Fla.App. 1962, 138 So.2d 386.
[12] Sapir v. United States, 348 U.S. 373, 75 S.Ct. 422 (1955).
[13] Skiff v. State, 1932, 107 Fla. 90, 144 So. 323. The court has referred to the presence of corroboration in affirming convictions on allegedly insufficient evidence. Tsimpicas v. State, 1940, 142 Fla. 587, 195 So. 150; Thomas v. State, Fla. 1964, 167 So.2d 309.
[14] In Missouri, the rule is that corroboration is unnecessary except that "when the evidence of such prosecutrix is of a contradictory nature, or when applied to the admitted facts in the case her testimony is not convincing but leaves the mind of the court clouded with doubts, she must be corroborated, or the judgment cannot be sustained." State v. Tevis, 1911, 234 Mo. 276, 284, 136 S.W. 339, 341. See also State v. Burton, 1946, 355 Mo. 467, 196 S.W.2d 621.
[15] Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, (U.S. Apr. 6, 1970); Waller v. Florida, 397 U.S. 397, 90 S.Ct. 1184, 25 L.Ed.2d 435 (U.S. Apr. 6, 1970); Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).
[16] Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1944); Watkins v. United States, 409 F.2d 1382 (5th Cir.1969); Clark v. United States, 293 F.2d 445 (5th Cir.1961); Sentner v. United States, 253 F.2d 310 (8th Cir.1958); Lee v. United States, 245 F.2d 322 (9th Cir.1957).
[17] West's Digests, Criminal Law, Key Number 763; Rape, Key Number 51(1).
[18] Genesis 38:8-10.
[19] See Note, Forcible and Statutory Rape: An Exploration of the Operation and Objectives of the Consent Standard, 62 Yale L.J. 55 (1952).
[20] Chief Judge Prettyman, in Farrar v. United States, 1959, 107 U.S.App.D.C. 204, 275 F.2d 868 at page 875, explaining in a memorandum on petition for rehearing en banc, points out that the question which there divided the D.C. Circuit was not one of evaluating credibility but one of law. Insufficient evidence there resulted in a judgment of acquittal. The type of insufficiency as we here discuss it was not discussed, but the case is interesting for comparative purposes.
[1] Seemingly, a more logical construction of the language used in § 915.01 is that the three-term span does not begin until the first day of the term next ensuing after he has been indicted. But the point here is strictly academic.