THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND DICK, Defendant-Appellant.

First District (5th Division)   No. 83—2989

Opinion filed February 27, 1987.

PINCHAM, J., dissenting.

Steven Clark, of State Appellate Defender's Office, of Chicago (Jeffry S. Spears, of Winston & Strawn, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Roger L. Kemp, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

In a bench trial defendant was convicted of aggravated kidnaping and rape, receiving concurrent 12-year sentences for those offenses. On appeal he contends: (1) his guilt was not established beyond a reasonable doubt, and (2) the trial court erred in refusing to admit into evidence an allegedly corroborating statement made by the defendant.

We affirm.

At the bench trial the following pertinent evidence was presented.

Linda L. testified that on February 8, 1982, she attended a meeting organized by her employer, an advertising agency, at the Westin Hotel in Chicago. At 6 p.m. she and other employees went to a nearby bar. Linda L. left the bar with a friend from work at about 10:30 p.m. She testified that she was "under the influence of alcohol." She got in a cab but then decided to take a bus. Although Linda L. could not recall who was driving this cab, other evidence at trial, including admissions made by the defendant, established that defendant was the driver.

After waiting five minutes for a bus, Linda L. hailed a cab, again driven by the defendant. When they arrived at her apartment building, she discovered she had no money for the fare. Defendant refused to allow her to get the money from her roommate. He initially agreed to accept a check, saying his name was John M. Anderson. But when Linda L. gave him the check and tried to leave, the door handle would not open. Defendant drove off with Linda L. still in the cab. She attempted to exit through the window but he grabbed her and would not let her leave. He told her he would drive to the police station and she agreed. But when he drove away from the direction of the station she asked where they were going. Defendant said if she could not pay with cash she would pay with her body.

Linda L. decided to feign illness so that defendant would not harm her. She slumped back in the seat, rolled her eyes up into her head, and hyperventilated as if suffering an epileptic fit. Defendant drove for about 20 minutes and then stopped on a deserted street. Defendant told her this was a Puerto Rican neighborhood and she should not bother to run. This statement and the tone of his voice made her believe it would be dangerous to flee. She continued to feign illness.

The defendant opened Linda L.'s door, grabbed her by the shoulder and arm, and pulled her out of the car. He carried her into a building and placed her on a bare mattress, where he slapped her. He took all her clothes off as well as his own. He then began to have intercourse with her. Linda L. lost consciousness. When she came to, the defendant was still on top of her, trying to kiss her. He slapped her again and got dressed. She was shivering and he placed a space heater by her and then put her clothes back on except for her bra and hose.

Defendant next dragged Linda L. out of the building by her arms and shoulders and put her back into the cab. Because she was still feigning illness she fell to the cab floor, where defendant left her. He drove back to her building, pulled her out of the cab by her arms and shoulders, and left her in the snow where she fell. As he drove off she saw that his license number was 914.

When the cab turned down another street, Linda L. ran screaming into her apartment building. Her roommate buzzed her up and she ran to their door, screaming that she had been raped. In the apartment she wrote down the number of the cab.

Linda L. telephoned a doctor friend for help. While on the phone three police officers walked in. She told them she had been raped, gave them the cab number, and described her assailant. She was then taken to the hospital. A tampon she wore because of a vaginal discharge was removed by a doctor, apparently because it had become lodged posteriorly. Linda L. testified that at the hospital her vaginal area was tender.

Linda L. was next taken to the police station, where she identified the defendant in a lineup. She was also taken to defendant's cab. She sat in it and still could not open the back door from the inside.

Linda L.'s roommate corroborated her account of her rape outcry. She testified that after being buzzed in, Linda L. came screaming down the hall. Her face was very red, her coat was wet and very dirty, and she was carrying her bra and panty hose in her hand. She was hysterical and distraught, saying that she was raped and repeat-

ing the number 914 over and over. She also wrote that number on a calendar. The roommate placed a call for Linda L. to a doctor friend. While Linda L. was on the phone the police arrived. The roommate later learned that one of the other tenants had called the police.

It was stipulated that Officer Dennis Vales would testify that at 1:40 a.m. he responded to a report of a woman screaming at Linda L.'s address. He found her to be initially hysterical, but when she calmed down she described her assailant and gave the police the cab number. According to Vales, Linda L. had been drinking.

Other stipulated testimony established that semen was found in vaginal swabs taken from Linda L. She was determined to be a type-O nonsecretor, whereas defendant was a type-B secretor. The vaginal swabs taken from Linda L. contained material from a type-B secretor.

It was also stipulated that if a Detective Davis were called he would testify that at about 2 a.m. on the morning in question he approached defendant's cab at gunpoint and asked if anyone had gotten out of the cab. Defendant said he had had no passengers for several hours. It was stipulated that Detective Gerald Mahon would testify that he observed Linda L. identify the defendant in a lineup. Mahon inspected the defendant's cab and found that the driver's side rear door would not open. The "passenger rear door" was very hard to open, apparently because ice and snow packed in the frame obstructed the door's movement. Mahon's stipulated testimony also indicated that Linda L. told him the defendant had slapped her a number of times to revive her.

When first interviewed by Mahon, the defendant said he was not involved in any rape incident. A second interview was then conducted by Mahon and Assistant State's Attorney Michael Leviton. It was stipulated that Leviton would testify that defendant told them the following. A man flagged him down at Michigan and Delaware. The man placed in the cab a girl who wanted the man to come with her. The girl had her legs wrapped around the man and the man was stroking her face and body. The girl left the cab and defendant took another fare two blocks and then returned to the first location, where the same girl got in the cab. She played with defendant's hair, pulled on his ear, and tried to kiss him. This almost caused an accident and defendant told her to stop. She put her feet over the front seat with her legs spread wide apart. She asked him if he thought she was sexy and told him to look at her. He turned around and she was holding her bra and panty hose, with her blouse unbuttoned, her breasts out, and her skirt up. She told him her mother was a hillbilly and they knew how to make good love. She climbed in the front seat, tried to

kiss him and also tried to give him an erection by rubbing him through his pants. She asked if he wanted a "blow job." Defendant told the investigators that he did not know what that was, his mother raised him better than that, so he just took her home. He did not have sex with her. She had no money so he did not get the fare. He would not take her checks because they were not in his name. The girl wanted anybody to go to bed with her. Finally, defendant said that he did not know how long he was with her.

Defendant presented the stipulated testimony of Major Ragland, a Yellow Cab mechanic. He inspected defendant's cab the morning after the incident and found all four doors to be working properly.

It was also stipulated that the act of intercourse described by Linda L. took place in a store front at 4435 West Fullerton in Chicago. It was stipulated that defendant's wife would testify that defendant ran a dog training school called "Love Enforcers" at that location. Finally, it was stipulated that Joseph Mahr, a private investigator, would testify that the most direct route between Linda L.'s home and the store front had 33 stoplights and two stop signs. The defendant did not testify, and he was barred from presenting a statement about the incident made by him to a Yellow Cab insurance representative.

The trial court found the defendant guilty of rape, aggravated kidnaping, and unlawful restraint, However, the latter charge was found to merge into the aggravated kidnaping conviction and judgment was entered only on the offenses of rape and aggravated kidnaping.

OPINION

The main issue before this court is whether the evidence presented at trial was sufficient to remove all reasonable doubt of defendant's guilt and establish with certainty that he was guilty of the crime of rape.

The basis of defendant's argument in seeking reversal of his conviction for rape is that (a) the record on appeal fails to show either forcible intercourse or that the victim offered sufficient resistance; and (b) complainant's testimony was not clear and convincing and lacked adequate corroboration.

We first turn to whether the act of intercourse was consensual or the result of force used by defendant. When examining the amount of force required to sustain a rape conviction, each case must be examined on the basis of its own particular facts. (*People v. Warren* (1983), 113 Ill. App. 3d 1, 446 N.E.2d 591.) While no definite

standard exists fixing the necessary degree of force or the accompanying degree of resistance (*People v. Schmitt* (1981), 99 Ill. App. 3d 184, 424 N.E.2d 1267), courts have generally held that resistance is not necessary where it is futile or foolhardy, where it would endanger the victim's life, or when the victim is overcome by superior strength or paralyzed with fear (*People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 431 N.E.2d 1154; *People v. Schmitt* (1981), 99 Ill. App. 3d 184, 424 N.E.2d 1267; *People v. McCann* (1979), 76 Ill. App. 3d 184, 394 N.E.2d 1055).

In the instant case, the record reveals that the victim first tried to escape from the defendant by leaving through the rear window of the cab, but the defendant grabbed her and would not let her go. There is also evidence that, as soon as she perceived she was in trouble, complainant feigned illness to protect herself, hoping that it was convincing enough so that defendant would not harm her and would leave her alone. The testimony at trial, however, shows that more physical force and intimidation was to be inflicted on her person as the evening progressed. Upon arriving at the building where the incident took place, defendant pulled complainant out of the cab and carried her inside to a room with a mattress, where he slapped her. He took the victim's clothes off and, after having sexual intercourse with her, slapped her again. When he was ready to leave, the defendant again grabbed the victim by her shoulders and arms, dragged her out of the building and pushed her back into the rear of the cab, where she fell to the floor. After returning the victim to her place of residence, defendant pulled her out of the cab and left her lying in the snow in front of her apartment building.

We find the foregoing facts to amply support the finding of actual force by the trial court. As the trial judge correctly noted, these are not the acts of a person who would be normally engaging in a consensual act of intercourse. Rather, they are the acts of an individual who, by means of sheer force, subjugates another to carry on his wishes under the threat of harm. We are not persuaded by defendant that the victim's conduct is consistent with that of an intoxicated woman who exercised bad judgment and became embarrassed when she had the opportunity to reflect upon what she had done. Although the complainant stated she was "under the influence of alcohol" the evidence in the record does not support the speculation that she consented to intercourse because she had been drinking. Indeed, in the defendant's fantastic account of the evening no intercourse was alleged to have taken place.

Complainant in the instant case perceived a very real and immi-

nent threat and immediately made up her mind that she was going to resist. Realizing that she could be easily physically overpowered by her assailant, who had already physically kept her from fleeing, she decided to fight back by feigning illness, hoping that defendant would be effectively dissuaded from sexually assaulting her if he saw that she was disabled with epilepsy. As the complainant explained at trial:. "I only wanted a chance to get—to try and be safe from him. I decided if I pretended I was sick that he wouldn't bother me and he'd leave me alone. So that if at anytime I would have stopped doing that he would have known I was just bluffing. Who knows what worse things he might have done? So I had to do it all the way through the same way. I mean it makes so much sense." Defendant argues that this constituted "ambiguous conduct" on the victim's part which did not reasonably manifest resistance. Under the circumstances of this case, however, this conduct does not appear to us to carry any ambiguity or to have been unreasonable. Indeed, the physical intimidation and force wielded by defendant against complainant left her with no other viable means of resistance. These facts are distinguishable from those in *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, cited by the defendant. In *Rosario* the victim simply did not resist and indicated that it was a lack of language skills (not knowing how to say "help" in English), not the fear of imminent danger that prompted her not to resist. Defendant's claim that the evidence in the instant case failed to show that intercourse was by force or that the victim offered resistance is therefore without merit.

■ Central to defendant's appeal for reversal of his conviction is also the contention that complainant's testimony at trial was not clear and convincing and that it lacked adequate corroboration. The rule of law governing such issues in rape cases is that the testimony of the victim alone is sufficient to support a conviction for rape if the testimony is clear and convincing. (*People v. Luigs* (1981), 96 Ill. App. 3d 700, 421 N.E.2d 961.) So long as it is clear and convincing the complainant's testimony need not be corroborated by other evidence. *People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285.

■ Here, the victim's testimony was not only by itself overwhelmingly clear and convincing as to all the facts and circumstances surrounding the rape, but it was also corroborated by an outcry witness and other witnesses. First, the victim herself took the stand and unequivocally recounted that she was unable to leave defendant's cab, was subsequently taken to a location unknown to her, slapped, raped, slapped again, then dragged in and out of the cab and finally left lying in the snow. This testimony was corroborated by an outcry wit-

ness who testified that immediately after the incident the victim had come home screaming hysterically that she had just been raped. This witness also testified that she noticed the victim's overcoat was very dirty and wet, that her face was red, and that soon after collapsing on her bed she repeated out loud the number 914 (the license plate number of defendant's cab).

The complainant's testimony concerning her rape was further corroborated by testimony that swabs and smears taken from the victim's vagina and panties revealed the presence of semen. At the hospital the victim experienced tenderness in her vagina and a tampon was found lodged posteriorly in her vagina. According to the victim that tampon had been inserted by her in order to control a vaginal discharge. Common sense leads us to believe that if the victim had consented to intercourse with defendant she would have first removed the tampon in her vaginal cavity. Furthermore, the presence of a tampon lodged posteriorly within the victim's vagina clearly shows that the intercourse between defendant and complainant was forcible.

■■ Courts of review have a special duty of carefully examining the evidence in rape cases. However, in doing so, the court may not encroach upon the function of the trier of fact to weigh the credibility and otherwise assess the evidence which was presented. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.) The trial court in the instant case correctly looked at the totality of the evidence in reaching its decision. It found that although there were some inconsistencies in the victim's testimony, these minor discrepancies were not sufficient to render her testimony not credible. Based upon the totality of the evidence the court thus concluded that, as to the crime of rape, the State had convincingly established defendant's guilt beyond a reasonable doubt. We see no reason to disturb the court's holding.

■■ Defendant next contends that the trial court erred in barring from evidence a "corroborating" statement made by him to a Yellow Cab insurance representative. The gist of this statement was that the complainant, while en route to her apartment, had told defendant various personal matters concerning herself and was laughing and acting drunk. Defendant claims the statement was not to be offered for the truth of the matter asserted but rather to show his state of mind on February 22, 1982, the day he made the statement to Yellow Cab's investigator, and, purportedly, before he reasonably had the ability to fabricate the evidence.

We find this argument lacking in persuasion. It appears that defendant offered the out-of-court statement for no other reason than to prove the truth of the matter asserted, in order to bolster his cred-

ibility and avoid having to take the stand. Because this statement is clearly hearsay and no known exception to the hearsay rule exists that would allow this statement to be admitted, the trial court did not err in denying its submission into evidence. Further, we need not address the issue of corroboration of defendant's testimony since the defendant did not testify at this trial. (Defendant did testify at an earlier trial after which his motion for a new trial was granted.) Defendant's argument that if his testimony was doubted at trial he had the right to present evidence which corroborated his own story is thus merely an argument based on a hypothetical situation, rather than on what actually happened at trial. Because defendant did not testify at all, there was nothing that could be corroborated by the hearsay statement he sought to introduce.

■ Lastly, since we have found defendant's conviction for rape was proper, it follows that we must also uphold his conviction for aggravated kidnaping. Kidnaping occurs when one knowingly, by force or threat of imminent force carries a person from one place to another with intent secretly to confine him against his will. (Ill. Rev. Stat. 1985, ch. 38, par. 10—1(a)(2).) A kidnaper, within the definition of section 10—1, is guilty of aggravated kidnaping when he inflicts great bodily harm or commits another felony upon his victim. (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3).) Here, defendant forced the complainant to remain in the cab and transported her against her will to a building 20 minutes away. Once there, defendant took the victim to the rear of the building and forced her to have sexual intercourse. Defendant's conviction for aggravated kidnaping must therefore stand.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P.J., concurs.

JUSTICE PINCHAM, dissenting:
I dissent. The convictions should be reversed. There was no evidence that the act of sexual intercourse was by force or against the complainant's will, nor was there any evidence that the complainant resisted. Instead, the evidence established that the act of sexual intercourse was not by force and was not against the complainant's will and that the complainant did not resist.

Count I of the three-count information alleged that on or about

February 9, 1982, in Cook County, Illinois, "Raymond J. Dick, a male person of the age of fourteen years and upwards committed the offense of rape in that he had sexual intercourse with Linda, a female not the wife of said Raymond J. Dick, by force and against her will, in violation of Chapter 38, Section 11—1, Illinois Revised Statutes *** "

Section 11—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 11—1(a)) provides:

> "A male person of the age of 14 years and upwards who has sexual intercourse with a female, *not his wife, by force and against her will,* commits rape." (Emphasis added.)

The defendant was charged in count II with committing on the aforesaid date and place "the offense of aggravated kidnaping in that he, knowingly by force and threat of imminent use of force, carried Linda from one place to another with the intent to secretly confine Linda against her will and committed a felony, to wit: rape upon Linda, in violation of Chapter 38, Section 10—2(a—3), Illinois Revised Statutes ***."

Kidnaping is defined in sections 10—1(a)(1) and (a)(2) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 10—1(a)(1) and (a)(2)) as follows:

> "(a) Kidnaping occurs when a person knowingly:
>
> (1) And secretly confines another against his will, or
>
> (2) By force or threat of imminent force carries another from one place to another with intent secretly to confine him against his will ***."

Aggravated kidnaping is defined in section 10—2(a)(3) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 10—2(a)(3)) as follows:

> "(a) A kidnaper within the definition of paragraph (a) of Section 10—1 is guilty of the offense of aggravated kidnaping when he:
>
> * * *
>
> (3) Inflicts great bodily harm or commits another felony upon his victim ***."

It was alleged in count III of the information that the defendant on the aforesaid date and place "committed the offense of unlawful restraint in that he, knowingly without legal authority detained Linda, in violation of Chapter 38, Section 10—3, Illinois Revised Statutes *** "

Section 10—3(a) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 10—3(a)) provides:

> "(a) A person commits the offense of unlawful restraint when

he knowingly without legal authority detains another."

The defendant was initially found guilty of these crimes by a jury. The trial judge, when granting the defendant's motion for a new trial, stated:

> "[T]he court will grant a new trial, and I think it's necessary that I explain why.
>
> I think it is obvious to everybody who was involved in the trial that this was a very close case.
>
> * * *
>
> [A]ll of these errors which I have commented on, combined in a case which is extremely close, I think warrants a new trial and, accordingly, the court will grant the motion for a new trial."

Three weeks after the defendant's motion for a new trial was granted, the State requested the trial judge to reconsider his ruling. In denying the State's motion for reconsideration and in affirming the ruling granting the new trial, the trial judge again stated:

> "I still believe that it was a close case. I still believe that as a result of all the things that happened the defendant did not receive a fair trial and that there is a substantial possibility that this defendant could have been found not guilty if there had not been the errors outlined ***."

The case was assigned to another judge for trial and the defendant waived trial by jury. His motion for a finding of not guilty at the close of the State's case was denied. In his defense he presented evidence, by stipulation, hereinafter discussed. The defendant did not testify. The trial judge found defendant guilty on all three counts—the alleged rape, aggravated kidnaping and unlawful restraint.

The defendant contends on this appeal that there was no evidence that the act of sexual intercourse was with force or was against the complainant's will, that the complainant resisted, or that resistance by the complainant was futile or would have endangered her life or subjected her to physical harm, or that the complainant was paralyzed by fear or that she was overcome by the defendant's superior strength. The defendant further contends that there was no evidence of any threat of physical harm, violence, intimidation, or of abusive, vile, vulgar or menacing language, or that the defendant possessed or intimated that he possessed any weapon. The defendant also insists that the complainant did not utter one word of resistance or a single word to even indicate that she was unwilling to engage in an act of sexual intercourse. The defendant insists that the complainant's conduct did not suggest or portray resistance, but rather that her actions mani-

fested her willingness to engage in sexual intercourse.

The defendant urges that sexual intercourse with force and against the complainant's will and the complainant's resistance are prerequisites for rape and are designed to serve the important function of notifying the potential offender that his conduct is unapproved, unacceptable, without the complainant's consent and against her will.

In reversing the defendant's conviction for rape following a jury's verdict of guilty, the supreme court held in *People v. Qualls* (1961), 21 Ill. 2d 252, 257, 171 N.E.2d 612:

> "Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases. (*People v. Kazmierczyk* [(1934)], 357 Ill. 592.) It is the further duty of a reviewing court, where a verdict is returned by a jury in a criminal case, not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged. *People v. Abbate* [(1932)], 349 Ill. 147.
>
> We are constrained to say, after a careful reading of the entire record, that *the testimony of the prosecuting witness lacks verisimilitude.*" (Emphasis added.)

The supreme court again reiterated the following rule of law:

> " 'It is a fundamental rule in such cases that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has the use of her faculties and physical powers the evidence must show such resistance as will demonstrate that the act was against her will.' " *People v. Qualls* (1961), 21 Ill. 2d 252, 258, 171 N.E.2d 612.

In reversing the rape conviction in *People v. Faulisi* (1962), 25 Ill. 2d 457, 461, 185 N.E.2d 211, the supreme court held:

> "Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, (*People v. Qualls* [(1961)], 21 Ill. 2d 252; *People v. Kazmierczyk* [(1961)], 357 Ill. 592,) and it is the duty of the reviewing court not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged. *People v. Qualls* [(1961)], 21 Ill. 2d 252; *People v. Abbate* [(1932)], 349 Ill. 147.
>
> When the charge is forcible rape, the fact that the act of in-

tercourse was performed forcibly and against the will of the complaining witness is a necessary element of the crime which must be proved beyond a reasonable doubt. \*\*\* It is, however, fundamental that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will."

In reversing the defendant's conviction for rape following a bench trial, in *People v. Anderson* (1974), 20 Ill. App. 3d 840, 847-51, 314 N.E.2d 651, the following language and holding of this court is most applicable to and binding upon the case at bar:

"Defendant's contention that he was not proved guilty of rape beyond a reasonable doubt is predicated on his assertion that the testimony of complainant is implausible and that all of the evidence presented by the State is insufficient to prove that any of the alleged acts of intercourse were performed by force and against the will of complainant. It is fundamental that in order to prove the charge of forcible rape there must be sufficient evidence to demonstrate that the act was committed by force and against the will of the female. (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865; *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467.)

Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases. Moreover, in such cases it is the duty of a reviewing court not only to carefully review the evidence, but to reverse the judgment if that evidence does not remove all reasonable doubt and create an abiding conviction that the defendant is guilty of the crime alleged. (*People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211; *People v. Barfield* (1969), 113 Ill. App. 2d 390, 251 N.E.2d 923.) *The ultimate issue presented in the instant case is not that of credibility, but whether the evidence introduced by the State, even if believed, is sufficient to create an abiding conviction that the defendant is guilty of intercourse with the complainant by force and against her will.*

\* \* \*

After the careful scrutiny of the State's evidence which is required of a reviewing court, we hold that evidence insufficient to remove all reasonable doubt and to create an abiding conviction that the alleged acts of intercourse engaged in by

complainant and defendant were performed by force and against her will. The judgment of the trial court as it relates to the finding of guilty on the charge of rape must therefore be reversed." (Emphasis added.)

The ultimate issue presented in the case at bar, as in *Anderson*, is not that of credibility, but whether the evidence introduced by the State, even if believed, is sufficient to create an abiding conviction that the defendant is guilty of intercourse with the complainant by force and against her will. A review of the State's evidence reveals that it is insufficient and does not create an abiding conviction that the intercourse with the complainant was by force and against her will.

Linda was a secretary for an advertising company executive in Chicago.[1] On February 8, 1982, her office closed about 4 o'clock for a meeting—a company presentation at which the presidents gave speeches. The meeting was from 4 p.m. to 6 p.m., during which food and alcohol were served. Linda drank white wine. The evidence does not establish how much she drank. After 6 o'clock, Linda and a half dozen people, apparently her co-workers, went to the Earth Angel, a bar about a block west of the Westin Hotel at Delaware Street and Michigan Avenue. She was at the Earth Angel bar for approximately 4½ hours, during which time she drank Scotch and water. Again, the evidence does not reveal the quantity of Scotch and water that she consumed.

Linda and one of her co-workers left the Earth Angel bar about 10 o'clock. Linda testified:

"Q. Would you describe yourself as under the influence of alcohol when you left Earth Angel about 10 o'clock that night?

A. Yes, I was."

Linda forgot her purse, her co-worker returned for it, and they walked to the northeast corner of Delaware Street and Michigan Avenue, where her co-worker hailed a cab for Linda to ride home. Linda entered the cab but got out because she decided to take a bus. Her co-worker left to go home. A bus did not arrive and Linda hailed a Yellow Cab which was driven by the defendant. Linda testified:

"Q. The cab that you originally went into, what color was that?

A. It was a Yellow Cab Company cab.

Q. Do you recall observing the driver?

---

[1]The facts set forth in this dissenting opinion are derived exclusively from the testimony of Linda, except where otherwise indicated.

A. No.

Q. Could you tell if he was a male or female driving, if you recall?

A. I don't recall."

Linda testified that when she got in the defendant's cab she was under the influence of alcohol.

Linda told the defendant to take her to her apartment building in the 400 block on West Melrose. The defendant drove north on Lake Shore Drive to the Belmont Avenue exit, west to the Inner Drive, one block north to Melrose and west on Melrose to one or two buildings east of Linda's apartment building. Linda did not have the cab fare and the defendant refused to allow her to go to her apartment to obtain the fare from her roommate. The defendant told her that he had done that before but that he never got his money when he did. Linda wrote a check and handed it to the defendant. She then attempted to open the cab door but she could not. The defendant then proceeded to drive past Linda's building. Linda tried to roll down the window so she "could leave out the window." The defendant grabbed her and would not let her go. The defendant continued driving and told Linda that he was going to take her to the police station.

When the defendant held Linda and prevented her from leaving the cab there had been no intimation or suggestion about sexual intercourse. At this point the affray was solely because Linda could not pay the cab fare. Linda attempted to exit through either the right rear window or door. Linda testified that she never went to the left side of the cab and never rolled down the left window. The record does not reveal how the defendant was able to grab and hold Linda on the back seat to prevent her from getting out of the cab and simultaneously drive the cab.

Linda told the defendant that she agreed to go with him to the police station, which she knew was north at Halsted and Addison streets. When the defendant got to Broadway, instead of turning north to the police station, the defendant turned south on Broadway. Linda testified:

"Q. After he turned south, what did you do?

A. Well, I said where are you going and he told me that if I couldn't pay with cash I was going to pay with my body.

Q. After he said that to you, what did you do at that time?

A. Well, then I decided that I was in trouble so I had to do something to protect myself. So I decided to feign illness so that he wouldn't hurt me.

Q. When you said that you decided to feign illness, would

you tell the judge what you did?

A. Well, I slumped back in the seat and my eyes rolled up in my head and I started hyperventilating—breathing heavy like I was in an epileptic fit."

Hyperventilating and heavy breathing were ambiguous conduct. There is no evidence that this conduct was visible to the defendant or that he observed it as he drove. Assuming that he did, hyperventilating and breathing heavily were not indicative of resistance nor were they necessarily manifestations of disapproval to an act of sexual intercourse. Hyperventilating and breathing heavily could just as readily have been construed by the defendant as acquiescence. This is particularly so when Linda said nothing and expressed no objection when the defendant turned south on Broadway and said to her that if she couldn't pay with cash she was going to pay with her body.

The time was now about 11 o'clock in the evening. It seemed to Linda that the defendant drove for about 20 minutes. During this 20-minute drive Linda did not cry out. She did not roll down the window. Although she could feel the cab stopping momentarily for stoplights and stop signs, she made no attempt to get out of the cab. During the entire 20-minute drive she faked illness, as previously described, and did not say anything to the defendant and the defendant did not say anything to her.

Linda did not know where the defendant ultimately stopped the cab. The defendant told her that it was a Puerto Rican neighborhood and that she shouldn't bother to run. Linda testified:

"Q. *** [H]e said to you this is a Puerto Rican neighborhood so don't bother to run?

A. He said that while we were in the cab.

Q. What did you understand him to mean by that?

A. That it was dangerous where we were.

Q. Is that your understanding that a Puerto Rican neighborhood is dangerous?

A. Yes.

Q. Do you know any Puerto Rican people?

* * *

A. Yes, I do. It was his tone of voice that made me feel it was unsafe.

Q. His tone of voice? The driver's tone of voice when he said this is a Puerto Rican neighborhood, so don't run led you to believe that it was dangerous to run in that neighborhood?

A. Yes."

This testimony was similar to the complainant's testimony in *Peo-*

*ple v. Anderson* (1974), 20 Ill. App. 3d 840, 849, 314 N.E.2d 651, where the complainant's explanation for not telling two men she and the defendant passed that she was being held against her will and was being taken into a building was that both men were black and appeared to know the defendant and that she therefore did not believe they would help her. In reversing the rape conviction this court stated that justification for failure to make an outcry to a potential intervenor because that person was of the same race as the attacker was rejected in *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612. *(People v. Anderson* (1974), 20 Ill. App. 3d 840, 849.) Although the record in the instant case does not disclose whether Linda saw anyone on the street in the area, her implied reason for not crying out for help is as unacceptable as were the complainants' reasons in *Anderson* and *Qualls*.

The defendant came to the right side of the cab where Linda was, opened the door, grabbed her by the shoulder and arm, pulled her out of the cab and took her into a storefront building where the cab was parked. Linda did not protest. She did not make an outcry. She did not pull back. She did not struggle. She did not resist. She did not say no, she did not say don't, she did not say stop and she did not say quit. She did not say anything.

The evidence established, by stipulation, that the building the defendant and Linda entered was a storefront located at 4437 West Fullerton near the intersection of Fullerton and Kenneth avenues in Chicago; that the defendant was the lessee of the premises under a written lease, defendant's exhibit No. 11; that the defendant used the premises as a kennel and dog training school called Love Enforcers; that the city of Chicago issued defendant a dog kennel or cattery license for the premises for 1982; that the city of Chicago Commission on Animal Care and Control inspected the premises and issued its inspection report for the premises on January 27, 1982; and that telephone bills and Commonwealth Edison electric bills were issued in the defendant's name for the premises for 1982 during which there was a telephone in working order on the premises.

The evidence further established, by stipulation, that the normal driving time from the 400 block on Melrose, the complainant's residence, directly to 4437 West Fullerton, where the defendant drove Linda, was 20 minutes, that the distance was 2.7 miles and that there were 33 stoplights and two stop signs en route.

The defendant carried Linda to the back of the building and laid her on a bare mattress. Linda was still feigning illness. The defendant completely disrobed her. He took off her hat, scarf, winter coat,

boots, blouse, sweater, jean skirt, panty hose, bra and panties. Linda did not verbally or physically protest or resist the defendant's disrobing her. She did not ask the defendant not to disrobe her. Linda did not utter a single word to the defendant—from the moment the defendant told her at Broadway and Melrose that if she couldn't pay the cab fare with cash she was going to pay with her body—up to and even after the moment she was disrobed by the defendant. If Linda's feigned illness—hyperventilating and breathing heavily—was a preventive measure, surely by the time she was disrobed she realized that her ruse was unsuccessful. Yet, she did not verbally or physically protest or resist as she was being disrobed or even after she was disrobed.

After the defendant disrobed Linda he completely disrobed himself, which would appear to be extremely unusual behavior for an unarmed rapist. Surely there could have been no doubt in Linda's mind at this point of the defendant's intention. She must have known that her feigned ploy was not a deterrent. Yet, she did not protest or resist. The defendant exerted no force. He lay on top of Linda and had sexual intercourse with her. Again, Linda did not verbally or physically protest or resist.

Linda's failure to verbally or physically protest or resist is identical to the complainant's failure to verbally or physically resist in *People v. Warren* (1983), 113 Ill. App. 3d 1, 446 N.E.2d 591, where the defendant, a stranger, engaged the complainant in conversation as she stood alone overlooking the Carbondale, Illinois, city reservoir. The defendant lifted the complainant off the ground and carried her to a wooded area where he committed sexual acts on the complainant for which the defendant was convicted following a bench trial. On appeal the defendant admitted that he performed the sex acts but he contended that the complainant did not resist, that the acts were performed without force or threat of force and were not committed against the complainant's will. The appellate court reversed, and in language most applicable to the case at bar, held:

> "Despite professing fear for her safety, complainant concedes that defendant did not strike her or threaten to strike her or use a weapon. *** At no time did complainant tell defendant to leave her alone or put her down. Furthermore, complainant did not object when defendant instructed her to take off her pants, but instead she complied with his request by pulling down her pants part way.
> ***
> *In the case before us, defendant maintains that once com-*

*plainant became aware that defendant intended to engage in sexual relations it was incumbent upon her to resist. This resistance would have the effect of giving defendant notice that his acts were being performed without her consent.* It is well settled that if complainant had the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. \*\*\* Complainant's failure to resist when it was within her power to do so conveys the impression of consent regardless of her mental state, amounts to consent and removes from the act performed an essential element of the crime. \*\*\* *[S]he must communicate in some objective manner her lack of consent."* (Emphasis added.) 113 Ill. App. 3d 1, 5-6, 446 N.E.2d 591.

The facts of *People v. Taylor* (1970), 121 Ill. App. 2d 403, 257 N.E.2d 524, are strikingly similar to the facts in the case at bar. In *Taylor*, the defendant forced the complainant, a total stranger, to get in his car at night in a shopping center parking lot after stating that he had a gun and threatening to shoot her. The defendant then drove for 30 or 40 minutes to a one-lane dirt road in an isolated area where the defendant and complainant engaged in an act of sexual intercourse. The complainant testified that the act was with force and against her will. The defendant returned the complainant to an alley some distance from her home. The complainant walked to a fire station, where, after asking to use the telephone, she stated she had been raped. The defendant in *Taylor* admitted the act of sexual intercourse but argued that it was with the consent of the complainant, was not forcible and that he was not proved guilty beyond a reasonable doubt. The appellate court affirmed.

The State contended before the supreme court (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865) that the questions of consent and force were determinations for the trial court and that the finding that the complainant submitted out of fear of great bodily harm was plausible and fully supported by the evidence. Reversing the rape conviction because the evidence failed to establish that the act of sexual intercourse was by force and against the complainant's will, the supreme court held:

"The rules governing a determination of force in rape cases, and the review thereof, have been reiterated on a great number of occasions. As summarized in *People v. Faulisi* [(1962)], 25 Ill. 2d 457, we have held that reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, and it is the duty of the reviewing court not only to

consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged. *** [I]n order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will." 48 Ill. 2d 91, 98, 268 N.E.2d 865.

The defendant in *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, picked up the complainant in his car at her place of employment to drive her home. The defendant ultimately drove to the factory parking lot where he worked. There, according to the complainant, they struggled for about 30 minutes, he hit her in the face and succeeded in pulling her pants down and having sexual intercourse with her. This court stated:

"The principal issue on appeal is whether the admitted act of sexual intercourse was proved beyond a reasonable doubt to be forcible and against the will of the complainant.

The Supreme Court of Illinois has held that in order to prove the charge of forcible rape there must be evidence to show that the act of intercourse was committed by force and against the will of the female. *** [I]f the complainant has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865; *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467; *People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211.) ***

Here, as in *People v. Faulisi* (1962), 25 Ill. 2d 457, the evidence is undisputed that defendant had no weapon. In *Faulisi*, the complainant had testified that defendant said he would not harm her if she went along with him, but made no other threats of physical violence. *In the instant case, defendant made no threats of physical violence whatsoever.* Complainant's testimony indicates that she submitted to two acts of intercourse, made no outcries, and did not attempt to escape ***.
* * *

Voluntary submission by a female who has the power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of forcible rape. *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467, citing *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d

612." (Emphasis added.) 110 Ill. App. 3d 1020, 1023-25, 443 N.E.2d 273.

The majority strongly relies, mistakenly I submit, on Linda's testimony that, after she entered the building and lay on the mattress, the defendant slapped her before the act of intercourse as evidence that the intercourse was with force and against Linda's will. First, Linda's testimony that the defendant slapped her before the intercourse belatedly came for the first time on cross-examination after she had had an adequate opportunity to reflect on the absurdity of her original version of the episode.

Second, Linda's testimony that the defendant slapped her after she lay on the mattress and before the intercourse is ludicrous. By Linda's admission, she had not voiced any objection to the intercourse. She had not in any way resisted or indicated to the defendant any unwillingness to engage in the sex act. Thus, there was absolutely no reason for the defendant to exert any force or slap her to induce her to submit.

Third, Linda's testimony of the slap was dubious, unclear, unpersuasive and unconvincing. Her vacillating testimony of the slap was as follows:

"Q. You said a while ago when you were talking with Mr. Locallo that the cab driver slapped you; is that right?

A. Yes.

Q. That is your testimony?

A. Right.

Q. And that was after you had passed out?

A. I'm sorry. I'm getting confused. He slapped me. I know he slapped me when I was first laid down on the bed and he slapped me again later.

Q. You told this to the detective at Belmont and Western?

\* \* \*

A. I don't remember.

\* \* \*

Q. Did you tell the detective that the driver slapped you repeatedly about the face in order to revive you?

A. If that's what it says I said. I don't remember.

Q. You said that the driver then dressed you?

A. Right."

Fourth, Linda's trial testimony that she was slapped before the intercourse was contradicted and impeached by her statement to police officer Gerald Mahon immediately after the intercourse. Linda testified that she lost consciousness during the intercourse and that

when she regained consciousness the defendant was still on top of her. She still did not protest or resist. She testified that after the act of sexual intercourse the defendant slapped her. The intercourse had been completed and there certainly was but one reason for the defendant to slap her at this juncture. The one reason for the slap was stated by Linda to Officer Mahon, who testified, by stipulation, that Linda told him that the defendant slapped her a number of times to revive her. Linda did not testify that any pain or injury caused her to lose consciousness or that her loss of consciousness was preceded by pain, or why she lost consciousness. Under the facts presented it is reasonable to conclude that she lost consciousness because of her alcoholic inebriation. Under the facts presented the defendant's slap should not be construed as a force exerted to overcome Linda's will to engage in an act of sexual intercourse which took place before she was slapped. The majority's reliance on Linda's testimony of a preintercourse slap as evidence of force by the defendant to overcome Linda's will or as evidence of Linda's resistance is strained, to say the least.

In reversing the rape conviction in *People v. Qualls* (1961), 21 Ill. 2d 252, 258, 171 N.E.2d 612, the supreme court pointed out, "While there is testimony by the prosecuting witness that [the defendant] struck her *** this striking, according to her testimony, was not at the time of any act of intercourse, but subsequently, at the time she wanted to leave the apartment. There was no evidence of any other use of force, nor of bruises, marks, abrasions or contusions upon her body."

In the case before us, the defendant dressed after the intercourse, left Linda lying on the mattress and walked towards the front of the building. Linda saw a light come on and a few minutes later the light went off. The defendant came back and placed a space heater beside her. She was shivering and Linda assumed that the defendant brought her the space heater because he noticed her shivering. This was an unusually compassionate concern for a rapist.

After the defendant placed the space heater by Linda he stood there for a while. The defendant began to dress Linda. She continued to feign illness. The defendant put on Linda's underwear, her blouse, sweater, skirt and boots. He did not put her bra or panty hose on her. Linda testified:

"Q. Where did he take you then?

A. Into the cab. He opened the door, the back rear right passenger's door and he put me under the seat but since I was feigning illness, I went limp and fell on the floor of the cab."

Linda remained on the floor of the cab during the 20-minute drive back to her apartment building. They arrived about 1:40 a.m. En route, the cab stopped for stop signs and traffic lights. Linda did not attempt to roll down either of the rear windows or to get out either of the rear doors. Linda testified:

"Q. Upon stopping on your street, what did the defendant do?

A. He got out of his car and came around and opened the door that was by me and grabbed me by the arm and shoulders and pulled me out of the cab and I fell into the snow and he just let me lay there."

The defendant got in the cab and drove west on Melrose for about a half block to Broadway. Linda saw the cab number 914 painted in big black letters on the trunk of the car. That number was also on the door of the cab and on the Illinois license plate. The cab proceeded south on Broadway.

Linda entered her apartment building screaming and went to her fifth-floor apartment, where she told her roommate she had been raped. Linda did not call the police, nor did her roommate. Linda called a friend on the telephone. The police arrived shortly and Linda gave them Yellow Cab number 914, which she had recorded on a calendar. The officer saw no evidence of visible injuries on Linda but he did observe that she had been drinking.

Officer Davis testified by stipulation that at approximately 1:50 to 2 a.m. on February 9, 1982, he received a call about an alleged rapist in cab number 914, that he observed the cab in the area of Clark, La Salle and North Avenue, and that he arrested the defendant.

It is not clear and not at all surprising that the defendant endeavored to concoct a fabricated denial of the act of intercourse to the arresting officers. The defendant's admission to the officers that Linda was in his cab, intoxicated, his conversations with her, including the topic of sex, set forth in detail in the majority opinion, certainly demonstrates that the act of intercourse was consensual, without force and was not against Linda's will. Had the defendant's intercourse with Linda been rape—with force and against Linda's will—it would seem that the defendant would have denied that Linda was ever a passenger in his cab. It would be rather odd for the defendant to have raped Linda, then admit that she was in his cab and then deny the act of sexual intercourse. In any event, the burden was not on the defendant to disprove to the arresting officers or at trial that he raped Linda, or to prove that his sexual intercourse with her was consensual and not against her will. The burden was on the State to

prove beyond a reasonable doubt that the act was not consensual and that it was forced and against Linda's will. That burden never shifted and the State did not sustain it in this case.

Based on the foregoing, the State's evidence established that at about 11 p.m. the defendant drove Linda in a Yellow Cab from in front of her residence, told her that he was going to have sex with her, then drove for almost 3 miles, past 33 stoplights and two stop signs for 20 minutes, to a building leased to the defendant and in which he conducted a licensed business, that the defendant took Linda into the building, placed her on a mattress, undressed her, then undressed himself, that the defendant then had intercourse with Linda, that he obtained a space heater to relieve her of her cold discomfort, that the defendant dressed Linda, then dressed himself, put her back into his cab and returned Linda to her home at about 1:30 a.m., that during the entire 2½-hour episode, Linda never physically or verbally protested or resisted, that during the entire episode the defendant never used vile or profane language, did not threaten her, never displayed a weapon or even indicated to Linda that he was armed, that none of Linda's clothing was torn and that Linda was not injured in any way. Linda contends that the act of sexual intercourse was with force and against her will. As the supreme court stated in *People v. Coulson* (1958), 13 Ill. 2d 290, 296-97, 149 N.E.2d 96, "This testimony taxes the gullibility of the credulous. *** [T]he testimony was too improbable and unconvincing to sustain a conviction. Where testimony is contrary to the laws of nature, or universal human experience, this court is not bound to believe the witness." But even if the State's evidence is believed, it does not establish that the offense of rape was committed—that the act of sexual intercourse was with force and against the will and resistance of Linda. To so conclude demands a complete disregard of the facts.

The majority's assertion that Linda was unable to leave defendant's cab is simply not correct. Linda testified that when she gave the defendant the check while in the cab in front of her apartment building, the defendant drove off and that she attempted to get out the right rear door and thereafter attempted to lower the door window to get out but that the defendant grabbed her and told her he was taking her to the police station. Linda acquiesced. The defendant then told her she would pay the fare with her body. Linda testified that after she was told this she made no attempt to get out of the cab.

Linda testified on direct examination that at the police station someone had her sit in the cab to see if she could open the back door from the inside. On cross-examination, however, she testified that al-

though she had twice previously testified in this case—at the preliminary hearing and again in February 1983—her third testimony was the first time that she had ever said that at the police station she tried the cab door and could not open the door. Linda did not remember who at the Belmont police station took her to test the cab door. She testified that she had seen a police report of this incident. Nevertheless, the assistant State's Attorney promptly contradicted her when he stated, "I don't know of any existence of any report declaring that." Moreover, it was stipulated that Major Ragland, an 18-year mechanic and the lead mechanic for the Yellow Cab company garage at 1730 South Indiana, immediately after the defendant's arrest personally checked all four doors of defendant's cab and found that they were working properly.

In the absence of evidentiary support, the majority opines that Linda "perceived a very real and imminent threat and immediately made up her mind that she was going to resist. Realizing that she could be easily physically overpowered by the assailant, who had already physically kept her from fleeing, she decided to fight back by feigning illness." The majority does not identify the "very real and imminent threat" which Linda perceived. Her "feigning illness" did not constitute resistance or fighting back. The majority likewise neglects to identify the "physical intimidation" or "force" the defendant "wielded."

Linda did not state that she feared being physically overpowered by the defendant. Linda described the defendant as about 5 feet 8 inches tall, about 160 to 170 pounds and middle-aged.

In *People v. Warren* (1983), 113 Ill. App. 3d 1, 446 N.E.2d 591, the State contended that the defendant coerced complainant into engaging in deviate sexual acts by threatening to use physical force. The following language of this court in reversing the conviction in *Warren* is most applicable to the case at bar:

> "Defendant did not make [a threatening] statement while brandishing a weapon or applying physical force, a circumstance which would support the State's construction. Instead, we find that *the record is devoid of any attendant circumstances which suggest that complainant was compelled to submit to defendant.*
>
> In addition, the State argues that the threat of force was conveyed by the disparity of size and strength between the parties. The record shows that at the time of the incident complainant was 5'2" tall weighing 100 to 105 pounds, whereas defendant was 6'3" and 185 pounds. The State further main-

tains that the seclusion of the woods contributed to this threat of force. \*\*\* Aside from picking up complainant and carrying her into and out of the woods, defendant did not employ his superior size and strength. Furthermore, *complainant did not attempt to flee or in any meaningful way resist the sexual advances of defendant.*" (Emphasis added.) 113 Ill. App. 3d 1, 5, 446 N.E.2d 591.

In the case at bar, the defendant did not employ actual force, sheer force or threat of harm.

Without attempting to define or specify the numerous means of resistance available to Linda, a most viable means available to her was simply to tell the defendant, in plain and certain language, that she did not approve. The supreme court held in *People v. DeFrates* (1965), 33 Ill. 2d 190, 195, 210 N.E.2d 467:

"Voluntary submission by the female, while she has the power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of forcible rape."

The supreme court further pointed out in *DeFrates* that "In apparent recognition of the fact that the evidence shows no outcry or attempt to escape, and little, if any, physical resistance on the part of the prosecutrix, the People seek to justify these failures on the grounds that she was paralyzed by fear for her own safety \*\*\*. \*\*\* [T]here is nothing in the evidence which supports the conclusion that the prosecutrix was gripped by a paralyzing fear." (*People v. DeFrates* (1965), 33 Ill. 2d 190, 195, 210 N.E.2d 467.) In the case at bar the State did not attempt to justify Linda's failure to resist, cry out or attempt to escape on the ground that she was paralyzed by fear. Indeed, in the case at bar, as in *DeFrates*, there is nothing in the evidence to support the conclusion that Linda was gripped by a paralyzing fear.

In affirming the defendant's conviction, the majority relies on the evidence that Linda's overcoat was very dirty and wet and that her face was red. This reliance is misplaced. Whether the redness in her face was occasioned by the cold weather when she was pulled out of the cab and fell in the snow or by the defendant's slap, need not be decided. Her dirty, wet overcoat can be explained by her lying in it on the cab floor and by her fall and lying in the snow in front of her apartment building.

Significantly, Linda's coat, on which the majority relies as incriminating evidence, was the only garment that she wore that night that was not presented, offered or received as evidence at the trial. Yet,

the other garments worn by Linda, her panties, brassiere, panty hose, blouse, sweater and jean skirt, none of which was even slightly damaged, were marked as State's exhibits, identified by Linda and received in evidence at trial. Linda testified that her skirt was not torn, her blouse was not ripped and the buttons were intact, the seams in her panty hose were "fine," her sweater was not torn, her brassiere was not ripped—the hooks were intact and the straps were "fine."

In affirming the defendant's conviction the majority relies on the testimony of Linda's roommate that immediately after the incident the victim had come home crying hysterically that she had just been raped. This reliance is also misplaced. Again, it need not be decided whether, after a volunteered sexual intercourse with Linda, the defendant saw her fall in the snow in front of her apartment building and then abandoned her there instead of escorting her into the building, demeaned, humiliated and triggered Linda's wrath; nor need it be decided what provoked her anger. Linda's outcry in the case at bar, like the complainant's outcry in *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467, *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, and *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801, was unpersuasive, unconvincing and was not corroborative evidence because of her conduct which preceded her outcry.

In *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, there was evidence that the defendant drove the complainant home and that she immediately protested to her brother and sister-in-law that the defendant had raped her. The trial court found the defendant guilty of rape. This court reversed and held:

> "We are not unmindful that the complainant made an immediate complaint of rape to her brother. However, here, as in *De-Frates*, the events which preceded the complaint cause it to lose much of its weight. *** *The immediate complaint may be accounted for by the complainant's need to explain her late return. ***
>
> A defendant should not be deprived of his liberty without clear and convincing evidence of his guilt. After a careful review of the entire record which is required of a reviewing court, we are constrained to say that the testimony of the complainant is not sufficiently convincing to lead us to an abiding conviction of the defendant's guilt." (Emphasis added.) 110 Ill. App. 3d 1020, 1025, 443 N.E.2d 273.

In *People v. DeFrates* (1964), 53 Ill. App. 2d 277, 203 N.E.2d 188, the defendant, a heating and air conditioning engineer, went to the

complainant's home at about 2:45 a.m. to adjust a fan. The complainant claimed that the defendant raped her, after which she fled with her three children to the home of a neighbor to whom she immediately made an outcry and who promptly called the police. The trial court convicted the defendant of rape. The appellate court affirmed. The supreme court reversed and held:

"We are not unmindful that the prosecutrix made an immediate complaint of rape to her neighbors; however, the events which preceded it cause the complaint to lose much of its weight. Further, *it may as well be accounted for by a belated sense of guilt* occurring when a dalliance unintentionally extended into the daylight hours and the prosecutrix felt the need to explain the presence of defendant's auto on the driveway and his departure from the home in case they had been observed." (Emphasis added.) *People v. DeFrates* (1965), 33 Ill. 2d 190, 196, 210 N.E.2d 467.

In *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801, the defendant picked up the complainant in his car and drove her to an isolated area where he engaged in an act of sexual intercourse with her. Thereafter, the defendant drove the complainant home. The complainant promptly complained to her mother that the defendant had raped her. The defendant contended that the intercourse was not with force, was not against the complainant's will and that the complainant did not resist. The trial court found the defendant guilty of rape. In reversing, this court stated:

"The only facts which in any way tend to corroborate Miss Linn's testimony of the alleged rape are her immediate complaint to her mother and the presence of spermatozoa found in the subsequent examination. The presence of spermatozoa alone is evidence only of a recent act of intercourse. [Citation.] Miss Linn's immediate complaint is weakened by the facts testified to by her prior to her making the complaint ***. The complaint may well have been the result of a belated sense of guilt of what had transpired earlier in the evening. *People v. DeFrates* [(1965)], 33 Ill. 2d 190, 210 N.E.2d 467. On all the facts we are unable to say that the State proved forcible rape beyond a reasonable doubt." 76 Ill. App. 2d 135, 143, 221 N.E.2d 801.

The majority urges, gratuitously and erroneously, I submit, that "[c]ommon sense leads us to believe that if the victim had consented to intercourse with defendant she would have first removed the tampon in her vaginal cavity. Furthermore, the presence of a tampon lodged posteriorily within the victim's vagina clearly shows that the

intercourse between defendant and complainant was forcible." Linda never complained of any pain in her vaginal cavity during or after the intercourse, or before, during or after her examination by the physician at the hospital. She simply stated at the hospital that there was a "tenderness" in her vagina. On the facts before us and because of her inebriation it is just as reasonable to assume that Linda forgot that there was a tampon in her vaginal cavity, particularly since it was customarily inserted only during her menstrual period. In any event, on the facts in this case the presence of the tampon does not show that the intercourse between defendant and complainant was forcible any more than it shows that she forgot that it was in her vaginal cavity.

The trial court did not expressly identify or label what force the defendant employed in the commission of the sexual intercourse. Nor did the trial court expressly find that the sexual intercourse was with force. Implicit in the trial court's guilty finding of rape is a finding that the act was with force. Nevertheless, the language of the trial court strongly suggests that the trial court utilized an erroneous standard in determining that the evidence established the guilt of the defendant of rape beyond a reasonable doubt.

Before finding the defendant guilty of rape the trial court stated, "[T]he court does agree that the main issue involved in the case, even though there are some other issues, is as to whether or not the sexual act was *consensual or non-consensual*." (Emphasis added.) The trial court further noted, "[T]he complaining witness was pulled out of the building and taken to the building where the sexual intercourse took place," "that the defendant dragged the complaining witness out and she was thrown onto the floor of the cab,"[2] and that "when they arrived back at the complaining witness' abode *** she was pulled or dragged [and] *** fell into the snow." The trial court concluded, "None of those type of descriptions to this court appears to be an act that the court can regard as being consensual on the part of the complaining witness ***." The burden was not on the defendant to prove that the act of sexual intercourse was consensual. Rather, the burden was on the State to prove beyond a reasonable doubt that the intercourse was not only nonconsensual but also that it was with force, against the will of the complainant and, on the facts in this case, that the complainant resisted.

The trial court's reliance on *People v. Thomas* (1981), 96 Ill. App. 3d 443, 421 N.E.2d 357, *People v. Luigs* (1981), 96 Ill. App. 3d 700,

---

[2]The complainant testified that "since I was feigning illness, I went limp and fell on the floor of the cab."

421 N.E.2d 961, and *People v. Smith* (1965), 32 Ill. 2d 88, 203 N.E.2d 879, in finding the defendant guilty is grossly misplaced. In each of these cases the defendant (1) used force; (2) was armed with a weapon; (3) beat the complainant and (4) the complainant verbally and physically protested, resisted and fought back. None of these factors was present in the case at bar. Each of these factors is also present in the cases on which the majority relies and by reason thereof the majority's reliance on *People v. Schmitt* (1981), 99 Ill. App. 3d 184, 424 N.E.2d 1267, *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 431 N.E.2d 1154, *People v. McCann* (1979), 76 Ill. App. 3d 184, 394 N.E.2d 1055, and *People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285, in affirming the defendant's conviction is likewise grossly misplaced. Neither case is remotely analogous to the case at bar.

Spurious rape accusations denigrate women, undermine their warranted struggles for equality, tragically weaken credibility in authentic rape allegations and impair the success of *bona fide* rape prosecutions. Rapists should be banished from society, but as the supreme court stated in *People v. DeFrates* (1965), 33 Ill. 2d 190, 196, 210 N.E.2d 467, "A defendant should not be deprived of his liberty without clear and convincing evidence of his guilt." As this court held in *People v. Kepler* (1966), 76 Ill. App. 2d 135, 141, 221 N.E.2d 801:

> "A reviewing court will not hesitate to reverse a conviction where, after a review of all the evidence, there exists a grave and substantial doubt as to the guilt of the defendant due to a lack of credible evidence or the existence of improbable or unsatisfactory evidence. [Citation.] On the entire record of the case at bar there exists a serious doubt that the act of intercourse in question was performed through force and against the will of the complaining witness."

For these foregoing reasons, the defendant's rape conviction should be reversed. Because the evidence also failed to establish that the defendant, by force and threat of imminent use of force, carried Linda from one place to another or that he confined her against her will and committed an act of rape, the aggravated-kidnaping conviction should be reversed. The evidence did not establish the offense of unlawful restraint and that conviction should also be reversed.